**Susana MENDARO, Appellant,**

v.

**The WORLD BANK, a/k/a International Bank for Reconstruction and Development.**

No. 82–2247.

United States Court of Appeals, District of Columbia Circuit.

Argued 25 May 1983.

Decided 27 Sept. 1983.

Jamie S. Gorelick, Washington, D.C., with whom Jonathan B. Sallet, Washington, D.C., was on the brief, for appellant.

John H. Pickering, Washington, D.C., with whom Jay F. Lapin, Seth A. Davidson, Washington, D.C., and Andrew N. Vorkink, New York City, were on the brief, for appellee.

Before ROBINSON, Chief Judge, WILKEY, Circuit Judge, and MARKEY,* Chief Judge, United States Court of Appeals for the Federal Circuit.

Opinion for the Court filed by Circuit Judge WILKEY.

WILKEY, Circuit Judge:

This appeal requires us to decide whether the International Bank for Reconstruction and Development may be sued in United States courts by employees of the Bank seeking redress of employment related grievances. Appellant Susana Mendaro challenges the district court's dismissal of her action under Title VII of the Civil Rights Act of 1964,[1] arguing that the Articles of Agreement of the International Bank for Reconstruction and Development ("Articles of Agreement")[2] effectively waive the immunity from suit which the Bank would otherwise enjoy under the International Organizations Immunities Act.[3] Because the facially broad waiver of immunity contained in the Bank's Articles of Agreement must be narrowly read in light of both national and international law governing the immunity of international organizations, we affirm the decision of the district court.

## I. BACKGROUND

The International Bank for Reconstruction and Development, commonly referred to as the World Bank, is an international financial institution whose purposes include assisting the development of its member nations' territories, promoting and supplementing private foreign investment, and promoting long range balanced growth in international trade.[4] To meet these objec-

---

* Sitting by designation pursuant to 28 U.S.C. § 291(a).

1. 42 U.S.C. § 2000e to 2000e–17 (1976 & Supp. V 1981).

2. 27 December 1945, 60 Stat. 1440, T.I.A.S. No. 1502, 2 U.N.T.S. 134 [hereinafter cited as Articles of Agreement].

3. 22 U.S.C. § 288–288i (1976 & Supp. V 1981).

4. Articles of Agreement, *supra* note 2, at art. I(i)–(iii), 60 Stat. 1440, 2 U.N.T.S. 134.

tives the Bank is empowered to make direct loans to its members or to businesses located in the territories of its members;[5] participate in and guarantee loans placed through private investment channels;[6] issue, guarantee, and acquire its own securities; and invest in and guarantee other securities.[7] Membership in the World Bank is generally limited to those nations which participate in the International Monetary Fund and have paid in a specified amount of capital.[8] Since the Bank's genesis at the 1944 United Nations Monetary and Financial Conference at Bretton Woods, New Hampshire, more than 140 nations have joined as members.[9] United States participation in the Bank has been authorized by Congress since 1945.[10]

The World Bank is headed by a board of governors, composed of one governor and one alternate appointed by each member.[11] Actual operations are controlled by twelve executive directors, who meet under the chairmanship of a president selected by the executive directors.[12] The president functions as the chief operating officer of the Bank.[13] The administrative staff of the World Bank is currently composed of nearly 6,000 employees, including citizens from 110 countries. Although the majority are employed at the Bank's headquarters in Washington, D.C., the Bank has offices and resident missions in thirty-six countries.[14]

Susana Mendaro, an Argentine citizen, was hired as a researcher by the World Bank on 6 September 1977. She claims that during her term of employment she was the victim of a pattern of sexual harassment and discrimination by other Bank employees. Her supervisors allegedly refused to provide her with the same number of assignments as her male coworkers, and at times thwarted her efforts to complete those assignments she had been given.[15] Mendaro alleges that one of her supervisors permitted other male employees to make unwanted verbal and physical advances toward her.[16] In addition, Mendaro claims that the Bank refused to promote her to the position of consultant, although she allegedly performed some of the duties of consultants.[17] Mendaro complained to the Bank about these problems, but felt that they had not been investigated or remedied effectively.[18] Some time after these complaints she was informed that her appointment with the Bank would expire on 30 June 1979.

Subsequent to her termination Mendaro filed a complaint with the Equal Employment Opportunity Commission ("Commission") alleging discrimination and retaliatory termination on the basis of sex in violation of Title VII of the Civil Rights Act of 1964.[19] The area office of the Commission dismissed the charges for lack of jurisdiction on 12 February 1980, concluding that the World Bank is an "international governmental agency ... not subject to the laws of the United States or any other member nation ...."[20] On 22 July 1980

5. *Id.* art. III § 4, 60 Stat. 1444, 2 U.N.T.S. 144.

6. *Id.; id.* art. IV § 1, 60 Stat. 1445, 2 U.N.T.S. 146, 148.

7. *Id.* art. IV § 8, 60 Stat. 1449, 2 U.N.T.S. 158.

8. *Id.* art. II § 1, 60 Stat. 1441, 2 U.N.T.S. 136.

9. Brief for Appellee at 2.

10. *See* 22 U.S.C. § 286 (1976).

11. Articles of Agreement, *supra* note 2, at art. V § 2, 60 Stat. 1450–51, 2 U.N.T.S. 160, 162.

12. *Id.* art. V § 4, 60 Stat. 1451–52, 2 U.N.T.S. 162, 164.

13. *Id.* art. V § 5, 60 Stat. 1452, 2 U.N.T.S. 164, 166.

14. Brief for Appellee at 2.

15. Amended Complaint ¶¶ 11–12.

16. *Id.* ¶ 13.

17. *Id.* ¶¶ 8–9.

18. *Id.* ¶ 14.

19. 42 U.S.C. §§ 2000e to 2000e–17 (1976 & Supp. V 1981).

20. Letter from Clarence Bell, Area Director of the Equal Employment Opportunity Comm'n to Susana Mendaro (12 Feb. 1980), Brief for Appellee at A–9, Memorandum of Points and Authorities in Support of Defendant's Motion to Dismiss app. IV, No. 80–1204 (D.D.C. 17 Sept. 1982).

the full Commission ratified this decision, and refused to take jurisdiction over her complaint.[21]

Mendaro then filed the present suit against the World Bank in the United States District Court for the District of Columbia. The World Bank responded by moving to dismiss the action, arguing that it is an international governmental organization not subject to its members' jurisdiction in suits arising out of the Bank's internal administrative affairs, such as the alleged violation of its employment contracts. Mendaro opposed the motion for dismissal. She conceded that the challenged activities of the Bank would ordinarily be immunized from judicial scrutiny, but claimed that the Articles of Agreement effectively waive the Bank's right to claim the immunities of an international organization. She cited as the primary basis of her argument Article VII section 3, which permits actions to be brought against the World Bank "in a court of competent jurisdiction in the territories of a member in which the Bank has an office, has appointed an agent for the purpose of accepting service or notice of process, or has issued or guaranteed securities." [22] Reading the Articles of Agreement as a whole, and relying on our decision in *Broadbent v. Organization of American States*,[23] the district court rejected Mendaro's interpretation of Article VII section 3 and dismissed the action for lack of jurisdiction. Given the scope of the facially broad waiver of immunity under Article VII section 3 of the Article of Agreement, the correctness of the district court's decision hinges on the extent of the World Bank's immunity from suit under the International Organizations Immunities Act.[24]

## II. DISCUSSION

### A. *International Organizations Immunities Act*

The primary source of national law on the immunity of international organizations is the International Organizations Immunities Act ("Act"),[25] which confers judicial status and immunities upon those international organizations in which the United States participates pursuant to a treaty or congressional act, and which have been designated by the president as being entitled to enjoy the provisions of the Act.[26] Section 2(b) of the Act defines the privileges accorded to qualified international organizations:

> International organizations, their property and their assets, wherever located, and by whomsoever held, shall enjoy the same immunity from suit and every form of judicial process as is enjoyed by foreign governments, except to the extent that such organizations may expressly waive their immunity for the purpose of any proceedings or by the terms of any contract.[27]

The immunity conferred by section 2(b) is subject to two sources of limitation. First, the organization itself may expressly waive its immunity. Second, the President may specifically limit the organization's immunities when he selects the organization as one entitled to enjoy the Act's privileges and immunities. At any time thereafter, such as when the organization abuses its privi-

---

21. *See* Letter from Leroy D. Clark, General Counsel of the Equal Employment Opportunity Comm'n to Cynthia A. Lewis (29 July 1980), Brief for Appellee at A–8, Reply *Memorandum* in Support of Defendant's Motion to Dismiss attachment II, No. 80–1204 (D.D.C. 17 Sept. 1982).

22. Articles of Agreement, *supra* note 2, at art. VII § 3, 60 Stat. 1457–58, 2 U.N.T.S. 180.

23. 628 F.2d 27 (D.C.Cir.1980).

24. 22 U.S.C. §§ 288–288i (1976 & Supp. V 1981).

25. *Id.*

26. The World Bank satisfies both prerequisites: United States participation in the Bank has been approved by Congress (22 U.S.C. §§ 286, 286h (1976)), and the World Bank has been properly designated by executive order (Exec. Order No. 9751, 3 C.F.R. 558 (1943–48 Comp.)).

27. 22 U.S.C. § 288a(b) (1976).

leges, the immunity may be modified, conditioned, or revoked by executive order.[28]

Although there has been no express waiver by the Bank of its immunity to this particular suit, the members of the World Bank effectively curtailed much of the Bank's immunity from judicial process in Article VII section 3 by stipulating the conditions under which actions may be brought against the Bank. When President Truman extended the Act's privileges and immunities to the World Bank, he limited the Bank's immunity by the terms of the functional waiver contained in the Bank's articles.[29] Thus, even though the extensive immunity conferred by section 2(b) would normally insulate the Bank from jurisdiction over this type of action brought by its employees,[30] this court must accept jurisdiction over Mendaro's claim unless the Articles of Agreement preserve the World Bank's immunity to suits by employees.

B. *The Scope of Article VII, Section 3, of the Articles of Agreement*

The full text of Article VII section 3 states:

*Position of the Bank with regard to judicial process*

Actions may be brought against the Bank only in a court of competent jurisdiction in the territories of a member in which the Bank has an office, has appointed an agent for the purpose of accepting service or notice of process, or has issued or guaranteed securities. No actions shall, however, be brought by members or persons acting for or deriving claims from members. The property and assets of the Bank shall, wheresoever located and by whomsoever held, be immune from all forms of seizure, attachment or execution before the delivery of final judgment against the Bank.[31]

Mendaro argues that Article VII section 3 constitutes a broad waiver of immunity from all suits commenced in a court of competent jurisdiction located in specified territories, subject to two clearly expressed exceptions: the Bank is absolutely immune from (1) suits by members of the Bank, and (2) actions seeking prejudgment attachment of the Bank's assets. Given the clarity of these reservations in Article VII section 3, she argues that the members of the Bank knew how to limit their waiver of the Bank's immunity from judicial process. The absence of other limitations arguably implies that the Bank chose not to place other restrictions on its waiver of immunity. Thus, Mendaro theorizes that the members must have affirmatively intended to waive the Bank's immunity to all other types of suits, including those brought by its own employees.

A similar line of argument was relied on in *Lutcher S.A. Celulose e Papel v. Inter-American Development Bank*.[32] Construing an identical waiver provision in the Articles of Agreement of the Inter-American Development Bank, *Lutcher* held that the articles of the Inter-American Development Bank effectively waived its immunity to a suit for breach of a loan agreement brought by one of the Bank's debtors, despite the Bank's assertion that its articles only waived immunity to suits brought by bondholders, creditors, and beneficiaries of creditors. Mendaro argues that this generous construction of the articles of the Inter-American Development Bank should be applied even more broadly to permit a suit brought by one of the World Bank's employees in a matter essentially arising out of an employee's charges of discrimination and breach of contract.

However, we are unable to read the somewhat clumsy and inartfully drafted language of Article VII section 3—which the *Lutcher* court admitted was "hardly a

---

**28.** *Id.* § 288.

**29.** Exec.Order No. 9751, 3 C.F.R. 558 (1943–48 Comp.).

**30.** *Broadbent v. Organization of American States,* 628 F.2d 27 (D.C.Cir.1980).

**31.** Articles of Agreement, *supra* note 2, at art. VII § 3, 60 Stat. 1457–58, 2 U.N.T.S. 180.

**32.** 382 F.2d 454 (D.C.Cir.1967).

model of clarity"[33]—as evincing an intent by the members of the Bank to establish a blanket waiver of immunity from every type of suit not expressly prohibited by reservations in Article VII section 3. The interpretation urged by Mendaro is logical only if the waiver provisions are read in a vacuum, without reference to the interrelationship between the functions of the Bank set forth in the Articles of Agreement and the underlying purposes of international immunities. When the language of Article VII section 3 is approached from this viewpoint it is evident that the World Bank's members could only have intended to waive the Bank's immunity from suits by its debtors, creditors, bondholders, and those other potential plaintiffs to whom the Bank would have to subject itself to suit in order to achieve its chartered objectives. Since a waiver of immunity from employees' suits arising out of internal administrative grievances is not necessary for the Bank to perform its functions, and could severely hamper its worldwide operations, this immunity is preserved by the members' failure expressly to waive it. Our reading of Article VII section 3 is both congruent with the other articles governing the Bank's relationship with its members and consistent with firmly established international treaty and customary law, United States case law, and the considered opinion of the United States Executive Branch.

1. *Policies Underlying the Immunity of International Organizations*

The strong foundation in international law for the privileges and immunities ac-corded to international organizations denotes the fundamental importance of these immunities to the growing efforts to achieve coordinated international action through multinational organizations with specific missions. It is well established under international law that "an international organization is entitled to such privileges and such immunity from the jurisdiction of a member state as are necessary for the fulfillment of the purposes of the organization, including immunity from legal process, from financial controls, taxes and duties."[34] The premises, archives, and communications of international organizations are shielded from interference by member states,[35] and international agreements often grant limited immunities to the officials of international organizations.[36] One of the most important protections granted to international organizations is immunity from suits by employees of the organization in actions arising out of the employment relationship. Courts of several nationalities have traditionally recognized this immunity,[37] and it is now an accepted doctrine of customary international law.[38]

Like the other immunities accorded international organizations, the purpose of immunity from employee actions is rooted in the need to protect international organizations from unilateral control by a member nation over the activities of the international organization within its territory.[39] The sheer difficulty of administering multiple employment practices in each area in which an organization operates suggests that the purposes of an organization could be greatly hampered if it could be subjected to suit

---

**33.** *Id.* at 456.

**34.** Restatement of the Foreign Relations Law of the United States (Revised) § 464(1) (Tentative Draft No. 4) (1983).

**35.** *Id.* § 465.

**36.** *Id.* § 466; *see also* 22 U.S.C. §§ 288d–288f.

**37.** *See, e.g., International Inst. of Agriculture v. Profili,* 5 Ann.Dig. 413 (Italy, Court of Cassation 1931); *Chemidlin v. International Bureau of Weights & Measures,* 12 Ann.Dig. 281 (France, Tribunal Civil of Versailles 1945); Dame Adrien & Others, 6 Ann.Dig. 33 (France, Conseil d'Etat 1931).

**38.** *See* A. Plantey, The International Civil Service §§ 133–34 (1981); Seyersted, *Jurisdiction Over Organizations and Officials of States, The Holy See and Intergovernmental Organizations,* 14 Int'l & Comp. L.Q. 493, 526 (1965); Restatement of the Foreign Relations Law of the United States (Revised) § 464 Comment a & Reporters' Note 4 at 73 (Tentative Draft No. 4) (1983).

**39.** *See* A. Plantey, The International Civil Service § 1343 (1981); C.W. Jenks, International Immunities 17–18 (1961).

by its employees worldwide. But beyond economies of administration, the very structure of an international organization, which ordinarily consists of an administrative body created by the joint action of several participating nations, requires that the organization remain independent from the intranational policies of its individual members. Consequently, the charters of many international financial institutions contain express provisions designed to guarantee the neutral operation of the organization despite the political policies of the member nations or the individual backgrounds of the organizations' officers,[40] and most large international organizations have established administrative tribunals with exclusive authority to deal with employee grievances.[41]

Decisions by United States courts have emphasized the importance of immunity from the jurisdiction of local courts in matters involving employment disputes. In *Broadbent v. Organization of American States*,[42] this court upheld the immunity of the Organization of American States from a suit brought by employees alleging breach of their employment contracts. We made it clear that

[t]he United States has accepted without qualification the principles that international organizations must be free to perform their functions and that no member state may take action to hinder the organization. The unique nature of the *international* civil service is relevant. International officials should be as free as possible, within the mandate granted by the member states, to perform their duties free from the peculiarities of national politics.... An attempt by the courts of one nation to adjudicate the personnel claims of international civil servants would entangle those courts in the internal administration of those organizations. Denial of immunity opens the door to divided decisions of the courts of different member states passing judgment on the rules, regulations, and decisions of the international bodies. Undercutting uniformity in the application of staff rules or regulations would undermine the ability of the organization to function effectively.[43]

This reasoning was later followed by *Tuck v. Pan American Health Organization*.[44] Similarly, in *Weidner v. International Tele-*

---

**40.** *See, e.g.,* Agreement Establishing the African Development Bank, art. 38, 4 August 1963, 510 U.N.T.S. 46, 88, 90, *reprinted in* A. Peaslee, International Governmental Organizations 3, 18 (Part I, Vol. 1) (3d ed. 1974) [hereinafter cited as Peaslee]; Agreement Establishing the Asian Development Bank, art. 36, 4 December 1965, 17 U.S.T. 1418, 1444, T.I.A.S. No. 6103, 571 U.N.T.S. 132, 180, 182, *reprinted in* Peaslee, *supra,* at 93, 112; Agreement Establishing the Caribbean Development Bank, art. 35, 18 October 1969, 712 U.N.T.S. 217, 274, *reprinted in* Peaslee, *supra,* at 194, 212–13; Agreement Establishing the Inter-American Development Bank, art. VIII § 5(f), 8 April 1959, 10 U.S.T. 3029, 3091, T.I.A.S. No. 4397, 389 U.N.T.S. 69, 118.

**41.** Restatement of the Foreign Relations Law of the United States (Revised) § 464, Reporters' Note 7 at 76 (Tentative Draft No. 4) (1983); A. Plantey, The International Civil Service § 1343 (1981). The World Bank has also recently established an administrative tribunal to resolve employees' claims based on employment contract disputes. Unfortunately, the tribunal was not created until after the events giving rise to Mendaro's claim against the Bank. Because

the tribunal is vested with only limited retroactive jurisdiction and is not explicitly authorized to resolve claims based on sexual harassment and discrimination, Mendaro opted not to file a complaint with the tribunal. Although we sympathize with Mendaro, this factor alone cannot give the court jurisdiction over the World Bank, since employee dissatisfaction with the efficacy of the administrative remedy is insufficient to dissolve the immunity of international organizations. *See Broadbent v. Organization of American States,* 628 F.2d 27 (D.C.Cir.1980); *International Institute of Agriculture v. Profili,* 5 Ann.Dig. 413, 415 (Italy, Court of Cassation 1931). To the extent widespread disregard of employees' contract rights indicates that an international organization is abusing its immunity from judicial process, a revocation of immunity under section 1 of the Act could be justified. *See* 22 U.S.C. § 288 (1976).

**42.** 628 F.2d 27 (D.C.Cir.1980).

**43.** *Id.* at 34–35 (footnotes omitted; emphasis original).

**44.** 668 F.2d 547 (D.C.Cir.1981).

*communications Satellite Organization*,[45] the District of Columbia Court of Appeals upheld the immunity of an international organization from an employee's breach of contract claim, even though the organization had not been designated under the Act until after the employee's claim accrued.

### 2. The Articles of Agreement

Of course, like other immunities, the immunity from employee suits may be waived by the members of the international organization, or its administrative directors. However, under national and international law, waivers of immunity must generally be expressly stated. The Act confers immunity "except to the extent that such organizations *expressly* waive their immunity for the purpose of any proceedings or by the terms of any contract."[46] The A.L.I. *Restatement (Second) of the Foreign Relations Law of the United States* provides that "[t]he immunity of an international organization may be waived only by an *express* waiver on the part of the organization."[47] The requirement of an express waiver suggests that courts should be reluctant to find that an international organization has inadvertently waived immunity when the organization might be subjected to a class of suits which would interfere with its functions.[48]

Article VII section 3 does expressly waive immunity, but the scope of its limitation on immunity is unclear. Since the purpose of the immunities accorded international organizations is to enable the organizations to fulfill their functions, applying the same rationale in reverse, it is likely that most organizations would be unwilling to relinquish their immunity without receiving a corresponding benefit which would further the organization's goals. Thus, most waivers are probably effected when an insistence on immunity would actually prevent or hinder the organization from conducting its activities. A nonspecific waiver such as that contained in Article VII section 3 should be more broadly construed when the waiver would arguably enable the organization to pursue more effectively its institutional goals. However, when the benefits accruing to the organization as a result of the waiver would be substantially outweighed by the burdens caused by judicial scrutiny of the organization's discretion to select and administer its programs, it is logically less probable that the organization actually intended to waive its immunity. Thus, limitations on immunity that subject the organization to suits which could significantly hamper the organization's functions are inherently less likely to have been intended, and a court's interpretation of the provision in dispute should start with that in mind.

Applying these principles to the World Bank's Articles of Agreement, we find no evidence that the members of the Bank intended to waive the Bank's immunity to employee suits. Other than the broad language of Article VII section 3, which does not affirmatively reserve the World Bank's immunity over employee actions, Mendaro has not pointed to any other articles which suggest the Bank's members were willing to subject the Bank to actions arising out of the Bank's dealings with its administrative staff. Her assertion that "there is nothing in the language of Article VII or in any other Article that limits the broad application of the waiver"[49] is contradicted by Article VII section 1, which states that the purpose of the waiver of immunity is *"[t]o enable the Bank to fulfill the functions with which it is entrusted."*[50] Thus, we cannot construe the vague language of Article VII section 3 more broadly than necessary to enable the Bank to fulfill its functions.

---

**45.** 392 A.2d 508 (D.C.1978).

**46.** 22 U.S.C. § 288a(b) (1976) (emphasis added).

**47.** RESTATEMENT (SECOND) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 84 (1965) (emphasis added).

**48.** *See id.* Comment b.

**49.** Brief for Appellant at 14.

**50.** Articles of Agreement, *supra* note 2, at art. VII § 1, 60 Stat. 1457, 2 U.N.T.S. 180.

The choice of terms adopted in Article VII section 3 also suggests that the Bank's immunity is limited only to the extent necessary to further its objectives. Article VII section 3 expressly subjects the Bank to suit in territories where the Bank has an office or an agent appointed to receive service of process, or has issued or guaranteed securities. These exceptions to its immunity were designed primarily to enhance the marketability of its securities and the credibility of its activities in the lending markets.[51] The Bank is specifically empowered to guarantee securities in which it has invested, "for the purpose of facilitating their sale."[52] This guarantee would mean little if beneficiaries of the guarantee could not sue to enforce the Bank's contracts. Potential investors would be much less likely to acquire the Bank's own securities if they could not sue the Bank to enforce its liabilities. Similarly, the commercial reliability of the Bank's direct loans and private loan guarantees would be significantly vitiated if its debtors and beneficiaries were required to accept the Bank's obligations without recourse to judicial process.[53]

A waiver of immunity with respect to the World Bank's commercial transactions with the outside world is also evident under Article VII section 3. If this immunity were not waived the Bank would be unable to purchase office equipment or supplies on anything other than a cash basis. Even the normal use of telephone and utilities might be placed on other than usual commercial terms. Such a restriction would unreasonably hobble its ability to perform the ordinary activities of a financial institution operating in the commercial marketplace.[54]

It is thus clear that the Bank's articles waive the Bank's immunity from actions arising out of the Bank's *external* relations with its debtors and creditors. However, a waiver of immunity to suits arising out of the Bank's *internal* operations, such as its relationship with its own employees, would contravene the express language of Article VII section 1. Rather than furthering the purposes and operations of the Bank, this waiver would lay the Bank open to disruptive interference with its employment policies in each of the thirty-six countries in which it has resident missions, and the more than 140 nations in which it could be involved in its lending and financing activities. Revising and administering consistent employment policies for a large administrative staff which includes citizens from more than 100 countries is difficult enough. If the Bank were required to adopt the local employment policies of each of its member

---

**51.** *See* RESTATEMENT (SECOND) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 84, Reporters' Note at 275 (1965).

**52.** Articles of Agreement, *supra* note 2, at art. IV § 8(ii), 60 Stat. 1449, 2 U.N.T.S. 158.

**53.** The members' intent to facilitate the issuance of securities by waiving the Bank's immunity to actions relating to its external activities is also evidenced by a comparison of the Bank's Articles of Agreement with those of the International Monetary Fund ("Fund"), which was also established by the 1944 Bretton Woods Conference. The Fund was created to promote international monetary cooperation and balanced growth in international trade. Articles of Agreement of the International Monetary Fund, art. I, 27 December 1945, 60 Stat. 1401, T.I.A.S. No. 1501, 2 U.N.T.S. 39, 40, 42. Membership in the Fund is usually a prerequisite to participation in the World Bank, Articles of Agreement, *supra* note 2, at art. II § 1, 60 Stat. 1441, 2 U.N.T.S. 136, and the Fund's privileges and immunities are generally identical to those of the Bank. Articles of Agreement of the International Monetary Fund, art. IX, 27 December 1945, 60 Stat. 1413–14, 2 U.N.T.S. 72, 74, 76. However, because the members did not design the Fund to issue securities or to duplicate the Bank's active role in commercial capital markets, the Fund's Articles of Agreement absolutely reserve its immunity from suit. *See id.* art. IX § 3. In contrast, the Bank's articles expressly subject it to judicial process in those jurisdictions where it has established an office, or issued or guaranteed securities. Articles of Agreement, *supra* note 2, at art. VII § 3, 60 Stat. 1457–58, 2 U.N.T.S. 180.

**54.** Since we are construing the extent to which the Articles of Agreement waive the Bank's immunity, we express no opinion on whether the Bank would, in the absence of a waiver, enjoy absolute immunity under the Act, or only the restricted immunity for noncommercial activities contemplated by the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602–1611 (1976).

countries this task would become nearly impossible. The employment laws of member nations rarely coincide precisely, and frequently conflict with those of other member nations. National policies governing mandatory retirement at a certain age often directly contradict each other.[55] So, too, do national laws governing discrimination in hiring. Thus, for example, the Bank would be hard pressed to establish and administer effective employment practices regarding Jewish employees in offices located in Middle Eastern countries, absent immunity for its employment related policies. Since a waiver of immunity from suits arising out of the Bank's internal relations would create such devastating administrative consequences without materially advancing its chartered objectives,[56] Article VII section 3 should not be construed as abrogating the Bank's immunity to actions arising out of its internal affairs.

It is true, as Mendaro argues, that many multinational corporations successfully operate worldwide, yet are often forced to conform their employment practices to the laws of each country in which they retain employees.[57] While this argument suggests that it may be possible to devise and administer consistent and fair employment policies in multiple jurisdictions, it completely overlooks the distinctions between private corporations and international organizations. Unlike private corporations, which are organized under the laws of one or more individual countries, international organizations are created by the joint action of several states. By definition, activities of international organizations are designed to resolve problems spanning national boundaries, with a benefit to be reaped collectively by the organizations' member nations. International organizations thus owe their primary allegiance to the principles and policies established by their organic documents, and not to the evolving legislation of any one member.

The Articles of Agreement of the World Bank reflect these principles. The Bank is required to "ensure that the proceeds of any loan are used only for the purposes for which the loan was granted ... without regard to political or other non-economic influences or considerations." [58] The Bank must cooperate with other general and public international organizations which discharge similar responsibilities in related fields.[59] The Bank, its officers, and staff "[o]we their duty entirely to the Bank and to no other authority." [60] Although they are recruited from as wide a geographical base as is possible,[61] the Bank's officers are absolutely proscribed from interfering with or being influenced by the political activities of the Bank's members.[62] The Bank's members have also agreed to accept the same restrictions upon their own relationship with the Bank: "Each member of the Bank shall respect the international character of this duty and shall refrain from all attempts to influence [the president, officers, or staff members] in the discharge of their duties." [63] In light of this strict policy

**55.** *See Broadbent v. Organization of American States,* 628 F.2d 27, 35 n. 26 (D.C.Cir.1980).

**56.** It is unlikely that a waiver of immunity from employee actions is necessary to attract highly qualified staff members (*see* Articles of Agreement, *supra* note 2, at art. V § 5(d), 60 Stat. 1452, 2 U.N.T.S. 166), since most international organizations have chosen to establish exclusive administrative tribunals to resolve employees' contract grievances rather than limit their immunity to judicial process. *See supra* note 41.

**57.** *See Sumitomo Shoji America, Inc. v. Avagliano,* 457 U.S. 176, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982).

**58.** *See* Articles of Agreement, *supra* note 2, at art. III § 5(b), 60 Stat. 1444, 2 U.N.T.S. 146.

**59.** *Id.* art. V § 8(a), 60 Stat. 1453, 2 U.N.T.S. 168.

**60.** *Id.* art. V § 5(c), 60 Stat. 1452, 2 U.N.T.S. 166.

**61.** *Id.* art. V § 5(d), 60 Stat. 1452, 2 U.N.T.S. 166.

**62.** *Id.* art. IV § 10, 60 Stat. 1449, 2 U.N.T.S. 158.

**63.** *Id.* art. V § 5(c), 60 Stat. 1452, 2 U.N.T.S. 166. Members may advocate changes in the Bank's administrative policies through their representatives on the Bank's board of governors. *See id.* art. V § 2, 60 Stat. 1450–51, 2 U.N.T.S. 160, 162.

of neutrality, and the obstruction to the Bank's purposes that would result if the Bank were subject to judicial scrutiny of its internal administrative affairs, we think it evident that Article VII section 3 only restricts the Bank's immunity to actions arising out of its external commercial contracts and activities.

### 3. Decisions of the Courts and Executive Branch

This interpretation of Article VII section 3 is consistent with our few prior decisions construing international charters containing a partial waiver of immunity from judicial process. In *Herbert Harvey, Inc. v. National Labor Relations Board*,[64] we approved of a determination by the National Labor Relations Board that the privileges and immunities set forth in the Articles of Agreement of the World Bank were sufficient to preclude the Board from asserting jurisdiction over the World Bank based on the Board's statutory authority. Consequently, Mendaro's argument that *Lutcher S.A. Celulose e Papel v. Inter-American Development Bank*[65] requires us to read Article VII section 3 as a blanket waiver of immunity is unpersuasive. In *Lutcher* a debtor of the Inter-American Development Bank sued the Bank for breach of contract, alleging that the Bank had violated implied provisions of its loan agreement by making subsequent loans to the debtor's competitor. Although the court construed a waiver provision identical to Article VII section 3 broadly enough to uphold its jurisdiction,

the action clearly arose out of the Bank's external lending activities. Additionally, the court noted that a waiver of immunity to suits by the Bank's borrowers would directly aid the Bank in attracting responsible borrowers.[66] Thus, *Lutcher* does not require us to interpret Article VII section 3 in a manner that would expose the Bank to potentially crippling litigation but not appreciably advance the Bank's ability to perform its functions.[67]

The result reached in these decisions has received the support of the Executive Branch. Considering whether the jurisdiction of the Equal Employment Opportunity Commission extends to the World Bank, the Department of State concluded that Article VII section 3

> was not designed (and should not now be construed) to subject the Bank to the full range of our domestic jurisdiction or to expose the Bank's internal personnel and administrative actions to review by our court and administrative agencies.
>
> . . . .
>
> Forcing the organizations to conform their personnel practices to the varying—and often conflicting—domestic laws in each country where they operate would create unmanageable administrative burdens and could well prevent them from carrying out the functions for which they were created.[68]

Ordinarily the opinion of the Executive Branch interpreting a treaty to which the United States is a party is entitled to great

---

**64.** 424 F.2d 770, 773 (D.C.Cir.1969).

**65.** 382 F.2d 454 (D.C.Cir.1967).

**66.** *Id.* at 459–60.

**67.** At least one pair of foreign decisions suggests that an international organization may implicitly waive its immunity to suits arising from the organization's external transactions, even though the organization is immune from employees' actions based on internal contract disputes. *Compare Branno v. Ministry of War,* 22 I.L.R. 756 (Italy, Court of Cassation 1954) (holding that the General Headquarters for Southern Europe established by the North Atlantic Treaty Organization had waived its immunity by contracting with a private party for

the provision of its dining facilities); *with Mazzanti v. H.A.F.S.I. & Ministry of Defense,* 22 I.L.R. 758 (Italy, Tribunal of Florence 1954) (upholding the immunity of the headquarters from a suit for breach of an employment contract).

**68.** Letter from Roberts B. Owen, Legal Adviser, Department of State, to Leroy D. Clark, General Counsel, Equal Employment Opportunity Comm'n (24 June 1980), Brief for Appellee at A–3 to A–4, Memorandum of Points and Authorities in Support of Defendant's Motion to Dismiss app. II at A–3 to A–4, No. 80–1204 (D.D.C. 17 Sept. 1982).

weight.[69] Given the consistency with which the conclusions of the Department of State have been followed by other agencies[70] we find no reason to diverge from this interpretation of the Articles of Agreement.

### III. CONCLUSION

We are persuaded that the members of the World Bank only intended to abrogate the Bank's immunity to actions relating to its external activities and contracts, and not the internal administration of its civil servants. Accordingly, the judgment of the district court is

*Affirmed.*

---

**69.** *Sumitomo Shoji America, Inc. v. Avagliano,* 457 U.S. 176, 184–85, 102 S.Ct. 2374, 2379–80, 72 L.Ed.2d 765 (1982).

**70.** *See Herbert Harvey, Inc. v. National Labor Relations Bd.,* 424 F.2d 770 (D.C.Cir.1969); *supra* notes 20 & 21.