# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued February 6, 2017    Decided June 23, 2017

No. 16-7051

BUDHA ISMAIL JAM, ET AL.,
APPELLANTS

v.

INTERNATIONAL FINANCE CORPORATION,
APPELLEE

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:15-cv-00612)

---

*Richard L. Herz* argued the cause for appellants. With him on the briefs were *Marco B. Simons* and *Michelle C. Harrison.*

*Deepak Gupta* was on the brief for *amicus curiae* Daniel Bradlow in support of appellants.

*Jennifer Green* was on the brief for *amicus curiae* Dr. Erica Gould in support of appellants.

*Francis A. Vasquez, Jr.* argued the cause for appellee. With him on the brief was *Maxwell J. Hyman.*

*Jeffrey T. Green* and *Sena N. Munasifi* were on the brief for

*amicus curiae* The International Bank for Reconstruction and Development, et al. in support of appellee.

Before: PILLARD, *Circuit Judge*, and EDWARDS and SILBERMAN, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* SILBERMAN.

Concurring opinion filed by *Circuit Judge* PILLARD.

SILBERMAN, *Senior Circuit Judge*:  Appellants, a group of Indian nationals, challenge a district court decision dismissing their complaint against the International Finance Corporation (IFC) on grounds that the IFC is immune from their suit.  The IFC provided loans needed for construction of the Tata Mundra Power Plant in Gujarat, India.  Appellants who live near the plant alleged—which the IFC does not deny—that contrary to provisions of the loan agreement, the plant caused damage to the surrounding communities.  They wish to hold the IFC financially responsible for their injuries, but we agree with the well-reasoned district court opinion that the IFC is immune to this suit under the International Organizations Immunities Act, and did not waive immunity for this suit in its Articles of Agreement.

## I.

Appellants are fishermen, farmers, a local government entity, and a trade union of fishworkers.  They assert that their way of life has been devastated by the power plant.[1]

---

[1] Appellants' complaint paints a dismal picture.  For example, the plant's cooling system discharges thermal pollution into the sea, killing off marine life on which fishermen rely for their income.

The IFC, headquartered in Washington, is an international organization founded in 1956 with over 180 member countries. It provides loans in the developing world to projects that cannot command private capital. IFC Articles, art. III §3(i), Dec. 5, 1955, 7 U.S.T. 2197, 264 U.N.T.S. 117. The IFC loaned $450 million to Coastal Gujarat Power Limited, a subsidiary of Tata Power, an Indian company, for construction and operation of the Tata Mundra Plant. The loan agreement, in accordance with IFC's policy to prevent social and environmental damage, included an Environmental and Social Action Plan designed to protect the surrounding communities. The loan's recipient was responsible for complying with the agreement, but the IFC retained supervisory authority and could revoke financial support for the project.

Unfortunately, according to the IFC's own internal audit conducted by its ombudsman, the plant's construction and operation did not comply with the Plan. And the IFC was criticized by the ombudsman for inadequate supervision of the project. Yet the IFC did not take any steps to force the loan recipients into compliance with the Plan.

The appellants' claims are almost entirely based on tort: negligence, negligent nuisance, and trespass. They do, however, raise a related claim as alleged third party contract beneficiaries of the social and environmental terms of the contract. According to appellants, the IFC is not immune to these claims,

---

Saltwater intrusion into the groundwater—a result of the plant's construction—means that farmers can no longer use that water for irrigation. (In fact, the villagers must purchase elsewhere freshwater necessary for consumption.) And because the plant is coal-powered, coal must be transported from nine miles away on an open-air conveyor system. During that relocation, coal dust and ash disperse into the atmosphere and contaminate the surrounding land and air.

and, even if it was statutorily entitled to immunity, it has waived immunity.

**II.**

Appellants are swimming upriver; both of their arguments run counter to our long-held precedent concerning the scope of international organization immunity and charter-document immunity waivers.

The IFC relies on the International Organizations Immunities Act (IOIA), which provides that international organizations "shall enjoy the same immunity from suit . . . as is enjoyed by foreign governments, except to the extent that such organizations may expressly waive their immunity for the purpose of any proceedings or by the terms of any contract." 22 U.S.C. § 288a(b). The President determines whether an organization is entitled to such immunity. 22 U.S.C. § 288. The IFC has been designated an international organization entitled to the "privileges, exemptions, and immunities" conferred by the statute. Exec. Order No. 10,680, 21 Fed. Reg. 7,647 (Oct. 5, 1956).

In response to the IFC's claim of statutory entitlement under the IOIA, appellants rather boldly assert that *Atkinson v. Inter-Am. Dev. Bank*, 156 F.3d 1335 (D.C. Cir. 1998), our leading case on the immunity of international organizations under that statute, should not be followed. *Atkinson* held that foreign organizations receive the immunity that foreign governments enjoyed at the time the IOIA was passed, which was "virtually absolute immunity." *Id*. at 1340 (quoting *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486 (1983)). And that immunity is not diminished even if the immunity of foreign governments has been subsequently modified, particularly by the widespread acceptance and codification of a "commercial

activities exception" to sovereign immunity.  *E.g.*, 28 U.S.C. § 1605(a)(2).

Attacking *Atkinson*, appellants make two related contentions.  First, *Atkinson* was wrong to conclude that when Congress tied the immunity of international organizations to foreign sovereigns, it meant the immunity foreign sovereigns enjoyed in 1945.  Instead, according to appellants, who echo the arguments pressed in *Atkinson* itself, lawmakers intended the immunity of the organizations to rise or fall—like two boats tied together—with the scope of the sovereigns' immunity.  In other words, even assuming foreign sovereigns enjoyed absolute immunity in 1945, if that immunity diminished, as it has with the codification of the commercial activity exception, Congress intended that international organizations fare no better.

The problem with this argument—even if we thought it meritorious, which we do not—is that it runs counter to *Atkinson's* holding, which explicitly rejected such an evolving notion of international organization immunity.  *See* 156 F.3d at 1341.  We noted that Congress anticipated the possibility of a change to immunity of international organizations, but explicitly delegated the responsibility to the President to effect that change—not the judiciary.  *Id.*  Morever, when considering the legislation, Congress rejected a commercial activities exception—which is exactly the evolutionary step appellants wish to have us adopt.  *Id.*  As the district court recognized, we recently reaffirmed *Atkinson*, saying that the case "remains vigorous as Circuit law."  *Nyambal v. Int'l Monetary Fund*, 772 F.3d 277, 281 (D.C. Cir. 2014).

Recognizing that a frontal attack on *Atkinson*'s holding would require an en banc decision, appellants next argued that we can, and should, bypass its precedential impact because the Supreme Court has undermined its premise—that in 1945 the

immunity of foreign sovereigns was absolute (or virtually absolute).

To be sure, the Court has said in dicta that in 1945, courts "'consistently . . . deferred to the decisions of the political branches—in particular, those of the Executive Branch—on whether to take jurisdiction' over particular actions against foreign sovereigns . . . ." *Republic of Austria v. Altmann*, 541 U.S. 677, 689 (2004) (quoting *Verlinden*, 461 U.S. at 486). But as a matter of practice, at that time, whenever a foreign sovereign was sued, the State Department did request sovereign immunity. *Id.* The only arguable exception involved a lawsuit in rem against a ship owned but not possessed by Mexico; it was not a suit against Mexico. *See Republic of Mexico v. Hoffman*, 324 U.S. 30 (1945). And, even if appellants are correct that the executive branch played an important role in immunity determinations in 1945, that does not diminish the absolute nature of the immunity those sovereigns enjoyed; although Supreme Court dicta refers to the *mechanism* for conferring immunity on foreign sovereigns in 1945, Executive Branch intervention does not speak to the *scope* of that immunity.

In any event, the *holding* of *Atkinson*—regardless how one characterizes the immunity of foreign sovereigns in 1945—was that international organizations were given complete immunity by the IOIA unless it was waived or the President intervened. And as we noted, that holding was reaffirmed in *Nyambal after* the Supreme Court dicta on which appellants primarily rely. Therefore, we conclude our precedent stands as an impassable barrier to appellants' first argument.

## III.

That brings us to the waiver argument. There is no question that the IFC has waived immunity for some claims. Indeed, its

charter, read literally, would seem to include a categorical waiver.[2] But our key case interpreting identical waiver language in the World Bank charter, *Mendaro v. World Bank*, 717 F.2d 610 (D.C. Cir. 1983), read that language narrowly to allow only the *type of suit* by the *type of plaintiff* that "would benefit the organization over the long term," *Osseiran v. Int'l Fin. Corp.*, 552 F.3d 836, 840 (D.C. Cir. 2009) (citing *Atkinson,* 156 F.3d at 1338 and *Mendaro*, 717 F.2d at 618).[3]

---

[2] The Articles of Agreement contains the following provision, titled "Position of the Corporation with Regard to Judicial Process":

> Actions may be brought against the Corporation only in a court of competent jurisdiction in the territories of a member in which the Corporation has an office, has appointed an agent for the purpose of accepting service or notice of process, or has issued or guaranteed securities.  No actions shall, however, be brought by members or persons acting for or deriving claims from members.  The property and assets of the Corporation shall, wheresoever located and by whomsoever held, be immune from all forms of seizure, attachment or execution before the delivery of final judgment against the Corporation.

IFC Articles, art. 6, § 3(vi).  That provision carries "full force and effect in the United States" under the International Finance Corporation Act.  22 U.S.C. § 282g.

[3] Appellants argue that *Mendaro* impermissibly overruled our earlier case, *Lutcher S.A. Celulose e Papel v. Inter-American Development Bank*, 832 F.2d 454 (D.C. Cir. 1967), without an intervening Supreme Court or en banc decision.  Appellants rely on dicta in *Lutcher*, but its holding was that the Inter-American Development Bank waived immunity to a breach of contract suit by a debtor.  382 F.2d at 456-68.  *Mendaro* expressly considered the rationale of *Lutcher* and declined to extend its holding to the suit before it.  717 F.2d at 614-17.  Indeed, the *Mendaro* test emerged in part from *Lutcher*'s discussion that the charter language at issue

To be sure, it is a bit strange that it is the judiciary that determines when a claim "benefits" the international organization; after all, the cases come to us when the organizations *deny* the claim, and one would think that the organization would be a better judge as to what claims benefit it than the judiciary. Perhaps that is why *Osseiran*, when applying *Mendaro*, refers to long-term goals, rather than immediate litigating tactics.

But whether or not the *Mendaro* test would be better described using a term different than "benefit," it is the *Mendaro* criteria we are obliged to apply. Ironically, the line of cases applying *Mendaro* ended up tying waiver to commercial transactions, so there is a superficial similarity to the commercial activities test that appellants would urge us to accept. But whatever the scope of the commercial activities exception to sovereign immunity, that standard is necessarily broader than the *Mendaro* test; if that exception applied to the IFC, the organization would *never* retain immunity since its operations are *solely* "commercial," i.e., the IFC does not undertake any "sovereign" activities.

The *Mendaro* test instead focused on identifying those transactions where the other party would not enter into negotiations or contract with the organization absent waiver. *See* 717 F.2d at 617 (inferring waiver only insofar as "necessary to enable the [organization] to fulfill its functions"). *Mendaro* provided examples: suits by debtors, creditors, bondholders, and "those other potential plaintiffs to whom the [organization] would have to subject itself to suit in order to achieve its chartered objectives." *Id.* at 615.

---

indicated waiver where "vulnerability to suit contributes to the effectiveness of the [organization's] operations." *Lutcher*, 382 F.2d at 456.

We have stretched that concept to include a claim of promissory estoppel, *see Osseiran*, 552 F.3d at 840-41, and a quasi-contract claim of unjust enrichment, *see Vila v. Inter-Am. Invest. Corp.*, 570 F.3d 274, 278-80 (D.C. Cir. 2009).  But all the claims we have accepted have grown out of business relations with outside companies (or an outside individual engaged directly in negotiations with the organization).[4] *Compare Lutcher S.A. Celulose e Papel v. Inter-Am. Dev. Bank*, 382 F.2d 454 (D.C. Cir. 1967) (finding waiver in debtors' suit to enforce loan agreement) *with Mendaro*, 717 F.2d at 611 (rejecting employee sexual harassment and discrimination claim); *Atkinson*, 156 F.3d at 1336 (rejecting garnishment proceeding against organization employee).

Appellants attempt to define "benefit" more broadly.  They argue that holding the IFC to the very environmental and social conditions it put in the contract, conditions which the IFC itself formulated, would benefit the IFC's goals.  Even though appellants had no commercial relationship with the IFC (other than, allegedly, as third party beneficiaries of the loan agreement's requirements), they contend that the IFC will benefit from their lawsuit because they are attempting to hold the IFC to its stated mission and to its own compliance processes.  They argue that obtaining "community support" is a

---

[4] Appellants do present a third party beneficiary claim, which, unlike their other claims, sounds in principles of contract law.  We have previously found the distinction between contract and non-contract claims relevant.  See *Vila* 570 F.3d at 280 n.3.  But even if appellants qualified as third party beneficiaries, a point we do not address, they were not a necessary negotiating party.  Accordingly, inferring waiver in this case stands at odds with the reasoning in *Mendaro*, i.e., that *Mendaro* implies waiver when the parties negotiated with the background of international organization immunity.

required part of any IFC project, and suggest that communities will be unlikely to support IFC projects if the IFC is not amenable to suit. Appellants' ability to enforce the requirement that the IFC protect surrounding communities is as central to the IFC's mission as a commercial partner's ability to enforce the requirement that the IFC pay its electricity bill.

But *Mendaro* drew another distinction between claims that survive and those that don't. Those claims that implicate internal operations of an international organization are especially suspect because claims arising out of core operations, not ancillary business transactions, would threaten the policy discretion of the organization. *Accord Vila*, 570 F.3d at 286-89 (Williams, J., dissenting).

That notion applies here. Should appellants' suit be permitted, every loan the IFC makes to fund projects in developing countries could be the subject of a suit in Washington.[5] Appellee's suggestion that the floodgates would be open does not seem an exaggeration. Finally, if the IFC's internal compliance report were to be used to buttress a claim against the IFC, we would create a strong disincentive to international organizations using an internal review process. So even though appellants convince us that the term "benefit" is something of a misnomer—its claim in some sense can be thought of as a "benefit"—it fails the *Mendaro* test.

Accordingly, the district court decision is affirmed.

*So ordered.*

---

[5] We need not reach appellee's alternative argument that this case may be dismissed under the doctrine of forum non conveniens.

PILLARD, *Circuit Judge*, *concurring*: I agree that *Atkinson* and *Mendaro*, which remain binding law in this circuit, control this case. I write separately to note that those decisions have left the law of international organizations' immunity in a perplexing state. I believe both cases were wrongly decided, and our circuit may wish to revisit them.

1. The International Organizations Immunities Act (IOIA), Pub L. No. 79-291, 59 Stat. 669 (1945) (codified at 22 U.S.C. § 288 *et seq.*), grants international organizations the same immunity "as is enjoyed by foreign governments." *Id.* § 2(b). When Congress enacted the IOIA in 1945, foreign states enjoyed "virtually absolute immunity," so long as the State Department requested immunity on their behalf. *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486 (1983). President Eisenhower designated the IFC as entitled to immunity under the IOIA in 1956. *See* Exec. Order No. 10,680, 21 Fed. Reg. 7,647 (Oct. 5, 1956). Congress and the courts have since recognized that foreign governments' immunity is more limited, as described by the Foreign Sovereign Immunities Act. 28 U.S.C. §§ 1604-05; *see Republic of Argentina v. Weltover*, 504 U.S. 607 (1992). We took a wrong turn in *Atkinson* when we read the IOIA to grant international organizations a static, absolute immunity that is, by now, not at all the same "as is enjoyed by foreign governments," but substantially broader.

When a statute incorporates existing law by reference, the incorporation is generally treated as dynamic, not static: As the incorporated law develops, its role in the referring statute keeps up. *Atkinson* itself correctly acknowledged that a "statute [that] refers to a subject generally adopts the law on the subject," including "all the amendments and modifications of the law subsequent to the time the reference statute was enacted." *Atkinson v. Inter-American Development Bank*, 156 F.3d 1335, 1340 (D.C. Cir. 1998) (emphasis omitted); *see El Encanto, Inc. v. Hatch Chile Co.*, 825 F.3d 1161, 1164 (10th Cir. 2016).

The IOIA references foreign sovereign immunity, but in *Atkinson* we did not apply the familiar rule of dynamic incorporation because we thought another IOIA provision showed that Congress intended that reference to be static. Section 1 of the IOIA authorizes the President to "withhold or withdraw from any such [international] organization or its officers or employees any of the privileges, exemptions, and immunities provided for" by the IOIA. IOIA § 1. We read that language to mean that Congress intended the President alone to have the ability, going forward, to adjust international organizations' immunity from where it stood as of the IOIA's enactment in 1945. *Atkinson*, 156 F.3d at 1341. That presidential power was, we thought, exclusive of any shift in international organizations' immunity that might be wrought by developments in the law of foreign sovereign immunity to which the IOIA refers.

Correctly read, however, section 1 merely empowers the President to make organization- and function-specific exemptions from otherwise-applicable immunity rules. It says that the President may "withhold or withdraw from *any such organization*"—note the singular—"or *its* officers or employees any of the privileges, exemptions, and immunities" otherwise provided for by the IOIA. IOIA § 1 (emphasis added). Section 1 thus empowers the President to roll back an international organization's immunity on an organization-specific basis. *See, e.g.*, Elizabeth R. Wilcox, *Digest of United States Practice in International Law* 405 (2009) (describing President Reagan's 1983 exercise of section 1 authority to withhold immunity from INTERPOL, followed by President Obama's 2009 restoration of the immunity after INTERPOL opened a liaison office in New York). Nothing about section 1 suggests that Congress framed or intended it to be the exclusive

means by which an international organization's immunity might be determined to be less than absolute.

The inference we drew from section 1 in *Atkinson* seems particularly strained because it assumes that Congress chose an indirect and obscure route to freezing international organizations' immunity over a direct and obvious one. If Congress intended to grant international organizations an unchanging absolute immunity (subject only to presidential power to recognize organization-specific exceptions) it could have simply said so. It might have expressly tied international organizations' immunity to that enjoyed by foreign governments as of the date of enactment. Or, even better, it might have avoided cross-reference altogether by stating that international organizations' immunity is absolute. As it happens, the original House version of the IOIA did just that, providing international organizations "immunity from suit and every form of judicial process." H.R. 4489, 79th Cong. (as introduced, Oct. 24, 1945; referred to H. Comm. on Ways and Means), but the Senate rejected that as "a little too broad," 91 Cong. Rec. 12,531 (1945), even as it retained the absolute immunity language in provisions granting the property of international organizations immunity from search, confiscation and taxation. *See* IOIA §§ 2(c), 6. In lieu of the House version's broad language, the Senate adopted the current formulation of section 2(b), which provides international organizations the "same immunity . . . as is enjoyed by foreign governments." H.R. 4489, 79th Cong. (as reported by S. Comm. on Finance, Dec. 18, 1945).

The considered view of the Department of State, harking back to before *Atkinson*, is that the immunity of international organizations under the IOIA was not frozen as of 1945, but follows developments in the law of foreign sovereign immunity under the FSIA. In a 1980 letter, then-Legal Adviser Roberts

Owen opined that, by "virtue of the FSIA, . . . international organizations are now subject to the jurisdiction of our courts in respect of their commercial activities." Letter from Roberts B. Owen, Legal Adviser, U.S. Department of State, to Leroy D. Clark, General Counsel, Equal Employment Opportunity Commission (June 24, 1980), *reprinted in* Marian L. Nash, *Contemporary Practice of the United States Relating to International Law*, 74 Am. J. Int'l L. 917, 917-18 (1980). Although the State Department's interpretation of the IOIA is not binding on the court, the Department's involvement in the drafting of the IOIA lends its view extra weight. *See* H.R. Rep. No. 79-1203, at 7 (1945) (referring to the draft bill as "prepared by the State Department"); *see also Sosa v. Alvarez-Machain*, 542 U.S. 692, 733 n.21 (2004) (citing a letter of the State Department's Legal Adviser and encouraging courts to "give serious weight to the Executive Branch's view" in cases that may affect foreign policy).

Reading the IOIA to dynamically link organizations' immunity to that of their member states makes sense. The contrary view we adopted in *Atkinson* appears to allow states, subject to suit under the commercial activity exception of the FSIA, to carry on commercial activities with immunity through international organizations. Thus, the Canadian government is subject to suit in United States courts for disputes arising from its commercial activities here, but the Great Lakes Fishery Commission—of which the United States and Canada are the sole members—is immune from suit under *Atkinson*. *See* Exec. Order No. 11,059, 27 Fed. Reg. 10,405 (Oct. 23, 1962); *see also* Convention on Great Lakes Fisheries, Can.-U.S., Sept. 10, 1954, 6 U.S.T. 2836. Neither the IOIA nor our cases interpreting it explain why nations that collectively breach contracts or otherwise act unlawfully through organizations should enjoy immunity in our courts when the same conduct

would not be immunized if directly committed by a nation acting on its own.

Were I not bound by *Atkinson*, I would hold that international organizations' immunity under the IOIA is the same as the immunity enjoyed by foreign states. *Accord OSS Nokalva, Inc. v. European Space Agency*, 617 F.3d 756, 762-64 (3d Cir. 2010) (declining to follow *Atkinson* and holding that restricted immunity as codified in the FSIA, including its commercial activity exception, applies to international organizations under the IOIA).

2.   *Atkinson*'s error is compounded in certain suits involving waiver under the *Mendaro* doctrine.  In *Mendaro v. World Bank*, we decided that courts should pare back an international organization's apparent waiver of immunity from suit whenever we believe the waiver would yield no "corresponding benefit" to the organization.  717 F.2d 610, 617 (D.C. Cir. 1983); *see Osserian v. Int'l Fin. Corp.*, 552 F.3d 836, 840 (D.C. Cir. 2009) (holding organization's facially broad waiver of immunity effective only as to types of plaintiffs and claims that "would benefit the organization over the long term").  That doctrine lacks a sound legal foundation and is awkward to apply; were I not bound by precedent, I would reject it.

It is undisputed that IOIA immunity may be waived, 22 U.S.C. § 288a(b), and the majority recognizes that the IFC's charter "would seem to include a categorical waiver." Maj. Op. 6-7 & n.2; *see* IFC Articles of Agreement art. 6, § 3, May 25, 1955, 7 U.S.T. 2197, 264 U.N.T.S. 118.  Half a century ago, we read the Agreement establishing the Inter-American Development Bank (IADB) to effectuate a broad waiver of the Bank's immunity.  *See Lutcher S. A. Celulose e Papel v. Inter-American Development Bank*, 382 F.2d 454, 457 (D.C. Cir.

1967) (Burger, J.). The IFC's Articles of Agreement, which use the same waiver language as did the IADB in *Lutcher*, would appear to waive the IFC's immunity here. Under the reasoning of *Lutcher*, the IFC, like the IADB in that case, may be sued in United States court.

But *Lutcher* was not our last word. As just noted, we decided in *Mendaro* to honor an international organization's "facially broad waiver of immunity" only insofar as doing so provided a "corresponding benefit" to the organization. 717 F.2d at 613, 617. We thought it appropriate to look to the "interrelationship between the functions" of the international organization and "the underlying purposes of international immunities" to cabin a charter document's immunity waiver. *Id.* at 615. The member states, we opined in *Mendaro*, "could only have intended to waive the Bank's immunity from suits by its debtors, creditors, bondholders, and those other potential plaintiffs to whom the Bank would have to subject itself to suit in order to achieve its chartered objectives." *Id.* We decided the waiver did not apply to the claim of Mendaro, a former Bank employee challenging her termination, because recognizing employment claims had no "corresponding benefit" for the Bank. *Id.* at 612-14.

We saw *Mendaro* as distinguishable from *Lutcher*. Allowing the debtor's claims in *Lutcher* "would directly aid the Bank in attracting responsible borrowers," whereas complying with the law governing the Bank's "internal operations" in *Mendaro* would not "appreciably advance the Bank's ability to perform its functions." *Id.* at 618-20 (emphasis omitted). In other words, *Mendaro* assumes that business counterparties will be unwilling to transact with an international organization if they lack judicial recourse against it, but that making employees' legal rights unenforceable against such an organization will not affect their willingness to work there. We

thus held that a facially broad waiver of an organization's immunity should be read not to allow employee claims.

The "corresponding benefit" doctrine calls on courts to second-guess international organizations' own waiver decisions and to treat a waiver as inapplicable unless it would bring the organization a "corresponding benefit"—presumably one offsetting the burden of amenability to suit. The majority acknowledges that "it is a bit strange" that *Mendaro* calls on the judiciary to re-determine an international organization's own waiver calculus. Slip Op. at 8. I agree that the organization itself is in a better position than we are to know what is in its institutional interests. But, whereas my colleagues point to the fact that "the cases come to us when the organizations *deny* the claim," *id.*, I would be inclined to think that organizations' assessments of their own long-term goals are more reliably reflected in their charters and policies—here, in the broad waiver included in IFC's Articles of Agreement— than in their litigation positions defending against pending claims.

It is not entirely clear why we have drawn the particular line we have pursuant to *Mendaro*. Why are suits by a consultant, a potential investor, and a corporate borrower in an international organization's interest, but suits by employees and their dependents not? *Compare, e.g.*, *Vila v. Inter-American Investment, Corp.*, 570 F.3d 274, 276, 279-82 (D.C. Cir. 2009) (permitting suit by a consultant); *Osseiran*, 552 F.3d at 840-41 (permitting suit by a potential investor); *Lutcher*, 382 F.2d at 459-60 (permitting suit by a corporate borrower), *with, e.g.*, *Atkinson*, 156 F.3d at 1338-39 (barring suit by a former wife seeking garnishment of former husband's wages); *Mendaro*, 717 F.2d at 618-19 (barring suit by a terminated employee asserting a sex harassment and discrimination claim).

Our cases seem to construe charter-document immunity waivers to allow suits only by commercial parties likely to be repeat players, or by parties with substantial bargaining power. But the opposite would make more sense: Entities doing regular business with international organizations can write waivers of immunity into their contracts with the organizations. *See, e.g.*, *OSS Nokalva*, 617 F.3d at 759 (contract clause authorizing software developer to sue European Space Agency in state and federal courts in New Jersey). Sophisticated commercial actors that fail to bargain for such terms are surely less entitled to benefit from broad immunity waivers than victims of torts or takings who lacked any bargaining opportunity, or unsophisticated parties unlikely to anticipate and bargain around an immunity bar.

The IFC successfully argued here that it would enjoy no "corresponding benefit" from immunity waiver. The local entities and residents that brought this suit contend that giving effect here to the IFC's waiver would advance the Corporation's organizational goals. The "IFC requires 'broad community support' before funding projects" like the Tata Mundra power plant, and "local communities may hesitate to host a high-risk project," the appellants contend, "if they know that the IFC can ignore its own promises and standards and they will have no recourse." Appellants Br. at 48-49. Without directly addressing the benefits of legal accountability to the communities it seeks to serve, the IFC contends that treating the waiver in its Articles of Agreement as effective here would open a floodgate of litigation in United States courts. That argument has it backwards: The IFC persuaded the majority to stem a litigation flood it anticipates only because the immunity waiver in the IFC's own Articles of Agreement opened the gate.

9

The perceived need for *Mendaro*'s odd approach would not have arisen if we had, back in *Atkinson*, read the IOIA to confer on international organizations the same immunity as is enjoyed by foreign governments—*i.e.* restrictive immunity that, today, would be governed by the FSIA. As the majority observes, Slip Op. at 8, the cases in which we have applied *Mendaro* to hold that claims are not immunity-barred look remarkably like cases that would be allowed to proceed under the FSIA's commercial activity exception. The activities we held to be non-immunized—such as suits by "debtors, creditors, [and] bondholders," *Mendaro*, 717 F.2d at 615, "suits based on commercial transactions with the outside world" affecting an organization's "ability to operate in the marketplace," *Osseiran*, 552 F.3d at 840, and unjust enrichment claims by commercial lending specialists, *Vila*, 570 F.3d at 276, 279-82—seem like just the kinds of claims that would be permitted under the commercial activity exception. We should have achieved that result, not via *Mendaro*'s "corresponding benefit" test, but by recognizing that the IOIA hitched the scope of international organizations' immunity to that of foreign governments under the FSIA. There is a time-tested body of law under the FSIA that delineates its contours—including its commercial activity exception. The pattern of decisions applying *Mendaro* may approximate some of the results that would have occurred had international organizations been subject to the FSIA, but *Mendaro* begs other important questions that assimilation of IOIA immunity to the FSIA would resolve.

Our efforts to chart a separate course under the IOIA were misguided from the start, and the doctrinal tangle has only deepened in light of the amorphous waiver-curbing doctrine that has developed under *Mendaro*. I believe that the full court should revisit both *Atkinson* and *Mendaro* in an appropriate

case.  But because those decisions remain binding precedent in our circuit, I concur.