# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued February 13, 2009         Decided June 19, 2009

No. 08-7042

JORGE VILA,
APPELLEE

v.

INTER-AMERICAN INVESTMENT CORPORATION,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 1:06-cv-02143-RBW)

*Nancy L. Perkins* argued the cause and filed the briefs for appellant.

*F. Douglas Hartnett* argued the cause and filed the brief for appellee.

Before: ROGERS and TATEL, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the court by *Circuit Judge* ROGERS.

Dissenting opinion by *Senior Circuit Judge* WILLIAMS.

2

ROGERS, *Circuit Judge*:  The Inter-American Investment Corporation ("IIC") appeals the denial of its motion to dismiss an independent consultant's unjust enrichment claim on grounds of immunity and untimeliness.  Applying the well-settled test in this circuit, we affirm the denial of immunity.  By waiving immunity from unjust enrichment claims of independent consultants whom the IIC solicits to help negotiate the commercial lending agreements that are central to its function, the IIC gains a corresponding benefit that furthers its objectives.  Consultants would be more willing to negotiate with the IIC and to enter into contracts with it if they had the reassurance that should their agreement or formal contract fail for whatever reason, they would be fairly compensated for any benefit they have provided that the IIC has unjustly retained.  Such a benefit affords the IIC flexibility in using independent consultants, allowing it, for instance, to establish and maintain relationships with consultants whom it may want to engage without a formal written agreement.  Furthermore, underlying an unjust enrichment claim are the same contract principles as the promissory estoppel claim held not to be barred by immunity in *Osseiran v. Int'l Fin. Corp.*, 552 F.3d 836 (D.C. Cir. 2009).  As the IIC has not posited litigation costs that are distinguishable from those involved in a claim for promissory estoppel, the IIC suggests no principled basis on which to distinguish our precedent involving international organizations with near-identical waiver provisions. Accordingly, taking the allegations of the complaint as true for purposes of the motion to dismiss, because the unjust enrichment claim was timely filed we remand the case to the district court.

**I.**

The IIC is an international organization formed by its member nations under the Agreement Establishing the Inter-American Investment Corporation, Nov. 19, 1984, T.I.A.S. No.

12087 (entered into force, March 23, 1986) ("IIC Charter"). Currently, forty-three countries, including the United States, are members of the IIC. *See* IIC Inter-American Investment Corporation: Member Countries, http://www.iic.int/ membercountries. As stated in its Charter, the purpose of the IIC is "to promote the economic development of its regional member countries by encouraging the establishment, expansion, and modernization of private enterprises." IIC Charter art. I, § 1. Together with other international organizations, the IIC fulfills this objective through commercial lending that is directed to private enterprises in the member countries. IIC Charter art. I, § 2. One way the IIC accomplishes this task is by structuring and arranging loans jointly with other lenders to finance projects in member countries.

Jorge Vila is an independent banking consultant in emerging markets. On several occasions from early 2001 to December 2002, the IIC engaged Vila's services through formal written contracts in connection with projects in Latin America and the Caribbean. According to the complaint, from January to August 2003, after Vila's previous contracts had expired, several of the IIC's senior officers requested Vila's consulting services with regard to four new projects, verbally agreeing to complete contractual documentation, including compensation, "later." Compl. ¶ 7. These projects related to the IIC's loan program and ranged from preparation of a marketing description of the organization's inter-bank loan program to assistance in loan syndication for specific projects. For example, Vila assisted IIC senior officers in obtaining a mandate from a Brazilian bank, Banco Safra, to arrange a syndicated credit facility for the bank. Vila identified potential participant banks, negotiated terms and conditions of the agreement with them and Banco Safra, and contributed to the draft, review, and distribution of the relevant confidential documents. *See* Compl. ¶ 8. Attached to the complaint are approximately 270 emails

documenting Vila's correspondence with the IIC's officers and clients and his services. These emails indicate that in addition to having Vila gather "intelligence" on prevailing interest rates, market conditions, and competitors, the IIC authorized Vila to negotiate terms and conditions of the projects with the IIC's clients, requested his participation in internal discussions of confidential financial information, and invited him to participate on conference calls with IIC clients regarding the projects.

Vila discussed his expectation of compensation with the IIC Regional Head Victor Moscoso between January and May 2003. According to the complaint, Moscoso acknowledged this expectation by email of June 2, 2003. Further, the IIC continued to solicit and accept Vila's services afterwards. Yet on August 4, 2003, while acknowledging Vila's work, Moscoso refused to compensate him and suggested new terms for his work in the future. When Vila appealed to Stephen Reed, the IIC's Deputy General Manager, he too acknowledged Vila's work but expressed a different understanding of the agreement between Vila and the IIC, noting the absence of a written contract while stating he would ensure Vila's work was "clarified and documented" by the IIC and Vila would be compensated "based on a success fee." Compl. ¶ 15. Vila rejected the notion of a success fee by email of September 10, 2003 to Reed, and on October 9, 2003, he emailed Jacques Rogozinski, General Manager of the IIC, an invoice in the amount of $89,909.00 for his services. On November 4, 2003, Alejandra Vallejo, IIC Coordinator of Institutional Affairs, advised Vila that the IIC could not process any payments for consulting services unsupported by a formal agreement with defined terms and conditions. Vila's appeals, beginning December 23, 2003 to Enrique Iglesias, then-President of the IIC, were to no avail, as were his further entreaties to two entities with oversight responsibilities over the IIC.

On October 26, 2006, Vila sued the IIC for breach of implied contract, unjust enrichment, defamation, and tortious interference with a prospective business advantage. Upon removal to federal court, *see* 22 U.S.C. § 283gg (2000), the IIC moved to dismiss the complaint on the grounds of immunity, pursuant to Federal Rule of Civil Procedure 12(b)(1), and because the statute of limitations had run, pursuant to Rule 12(b)(6). The district court dismissed all except the unjust enrichment claim and ruled that the complaint was timely filed. The IIC appeals, and the court has jurisdiction over this interlocutory appeal. *See Kirkham v. Societe Air Fr.*, 429 F.3d 288, 291 (D.C. Cir. 2005); *Rendall-Speranza v. Nassim*, 107 F.3d 913, 916 (D.C. Cir. 1997).[1] Our review is *de novo, see Vann v. Kempthorne*, 534 F.3d 741, 745-46 (D.C. Cir. 2008); *Kirkham*, 429 F.3d at 291, and in reviewing the denial of the motion to dismiss, we take the allegations of the complaint as true, *see Jerome Stevens Pharmaceuticals, Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253-54 (D.C. Cir. 2005); *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).

**II**.

The International Organizations Immunities Act applies to those organizations which the President designates as entitled to the benefits of the Act. Section 2(b) of the Act provides that such organizations "shall enjoy the same immunity from suit and every form of judicial process as is enjoyed by foreign governments, except to the extent that such organizations may

---

[1] On January 26, 2009, the district court denied the IIC's motion for certification of the limitations issue pursuant to 28 U.S.C. § 1292(b). This court had previously denied the IIC's motion to hold the appeal in abeyance pending the district court's ruling. *Vila v. Inter-Am. Investment Corp.*, Order No. 08-7042 (D.C. Cir. Oct. 7, 2008).

expressly waive their immunity for the purpose of any proceedings or by the terms of any contract." 22 U.S.C. 288a(b) (2008). By executive order, President Reagan so designated the IIC. Exec. Order No. 12,567, 51 Fed. Reg. 35,495 (Oct. 2, 1986). Article VII of the IIC's charter provides:

> Actions may be brought against the Corporation only in a court of competent jurisdiction in the territories of a member country in which the Corporation has an office, has appointed an agent for the purpose of accepting service or notice of process, or has issued or guaranteed securities.

IIC Charter art. VII, § 3(a). This waiver provision is nearly identical to that in the charter of the World Bank and is common to the charters of other international financial institutions, such as the Inter-American Development Bank and the International Finance Corporation.[2]

In *Mendaro v. World Bank*, 717 F.2d 610, 617 (D.C. Cir. 1983), the court formulated a test to determine whether such charter terms waive a specific type of lawsuit: "A nonspecific waiver such as that [at issue here] should be more broadly construed when the waiver would arguably enable the organization to pursue more effectively its institutional goals." Put another way, the "[organization]'s immunity should be construed as *not waived* unless the particular type of suit would

---

[2] *See* Articles of Agreement of the International Bank For Reconstruction and Development, art. VII, § 3, 27 Dec. 1945, 60 Stat. 1440, T.I.A.S. No. 1502, 2 U.N.T.S. 164, 180; Agreement Establishing the Inter-American Development Bank, art. XI, § 3, Apr. 8, 1959, 10 U.S.T. 3068, 3095; Articles of Agreement of the International Finance Corporation, art. VI, § 3, Dec. 5, 1955, 7 U.S.T. 2197, T.I.A.S. No. 3620.

*further* the [organization]'s objectives." *Atkinson v. Inter-Am. Dev. Bank*, 156 F.3d 1335 (D.C. Cir. 1998). Rejecting in *Mendaro* the view that the type of waiver in the IIC's Charter provides a "blanket waiver of immunity from every type of suit not expressly prohibited by reservations," 717 F.2d at 615, the court observed that if a lawsuit could "significantly hamper the organization's functions," *id.* at 617, then it is "inherently less likely to have been intended," *id.* So too "when the benefits accruing to the organization as a result of the waiver would be substantially outweighed by the burdens caused by judicial scrutiny of the organization's discretion to select and administer its programs, it is logically less probable that the organization actually intended to waive its immunity." *Id.* Contrasting the employee lawsuits at issue, which could "significantly hamper" the organization's functions given its multiple member countries, with claims related to "enhanc[ing] the marketability of its securities and the credibility of its activities in the lending markets," *id.* at 618, the court concluded "[p]otential investors would be much less likely to acquire the Bank's own securities if they could not sue the Bank to enforce its liabilities. Similarly, the commercial reliability of the Bank's direct loans and private loan guarantees would be significantly vitiated if its debtors and beneficiaries were required to accept the Bank's obligations without recourse to judicial process." *Id.* The court further concluded "[a] waiver of immunity with respect to the World Bank's commercial transactions with the outside world is . . . evident under Article VII section 3 [of its Charter]. If this immunity were not waived the Bank would be unable to purchase office equipment or supplies on anything other than a cash basis. . . . Such a restriction would unreasonably hobble its ability to perform the ordinary activities of a financial institution operating in the commercial marketplace." *Id.*

Following the analysis in *Mendaro*, the court recently held in *Osseiran*, 552 F.3d at 840, that the International Finance

Corporation ("IFC") had waived its immunity from a promissory estoppel claim concerning the IFC's alleged representations during negotiations for a sale of its investments to private parties. The court again reasoned that "parties may hesitate to do business with an entity insulated from judicial process; promises founded on good faith alone are worth less than obligations enforceable in court." *Id.* (citing *Atkinson*, 156 F.3d at 1338; *Lutcher S.A. Celulose e Papel v. Inter-Am. Dev. Bank*, 382 F.2d 454, 460 (D.C. Cir. 1967)). Observing that the IFC had identified "no unique countervailing costs," *id.*, the court concluded the broad terms of the waiver provision in the IFC's Charter were controlling and held the IFC was not immune from a lawsuit for promissory estoppel and breach of confidentiality, *id.* at 840-41.

It is a short step from this precedent to conclude that Vila's unjust enrichment claim, like Osseiran's promissory estoppel claim, is not barred by the IIC's immunity. Promissory estoppel provides a party with a remedy to enforce a promise where the formal requirements of a contract have not been satisfied, often serving as a substitute for one of these formal requirements, usually consideration. *Bender v. Design Store Corp.*, 404 A.2d 194, 196 (D.C. 1979). Therefore, when a contract fails for lack of consideration, courts will, in some circumstances, enforce the promise where the promisee has detrimentally relied. *Id.* The District of Columbia recognizes unjust enrichment as a species of quasi contract that imposes, "in the absence of an actual contract," "a duty . . . upon one party to requite another in order to avoid the former's unjust enrichment[,] . . . to permit recovery by contractual remedy in cases where, in fact, there is no contract." *4934, Inc. v. D.C. Dep't of Employment Servs.*, 605 A.2d 50, 55 (D.C. 1992). Like promissory estoppel, unjust enrichment provides a party with a remedy "to unwind entanglements" that may have arisen from a failed agreement, for instance, "where [the agreement] does

not comply with the writing requirement, where one of the parties is represented by an unauthorized agent," 1-1 CORBIN, CONTRACTS, § 1.20, or "where the agreement is too indefinite to be enforced," *id.* Underscoring the nature of promissory estoppel and unjust enrichment as remedies for failed agreements, courts tend not to allow either action to proceed in the presence of an actual contract between the parties. *See, e.g., Bloomgarden v. Coyer*, 479 F.2d 201, 210 (D.C. Cir. 1973) ; *Walker v. KFC Corp.*, 728 F.2d 1215, 1220 (9th Cir. 1984); *Bldg. Servs. Co. v. Nat'l R.R. Passenger Corp.*, 305 F. Supp. 2d 85, 95-96 (D.D.C. 2004) (citing *KFC Corp.* and collecting cases). And although unjust enrichment — like promissory estoppel — is not a contract remedy, in quasi contract it "give[s] rise to obligations more akin to those stemming from contract than from tort." *Jordan Keys & Jessamy, LLP v. St. Paul Fire*, 870 A.2d 58, 63 (D.C. 2005) (quoting *Bradkin v. Leverton*, 257 N.E.2d 643, 645 (N.Y. 1970)); *see also* CORBIN, *supra*, at § 1.20.

Like Osseiran, Vila seeks a remedy based on the failure of his alleged agreement with the IIC to meet the requirements of a formal contract. His claim, no less than Osseiran's, exists to prevent the injustice that would result if courts could not enforce such obligations. And, much as Osseiran's, Vila's claim arises out of commercial activity with the outside world that is directly related to the IIC's fulfillment of its chartered objectives. By assisting IIC officers, at their request, in identifying participant banks and negotiating with these banks to provide an interbank loan from the IIC to a private enterprise in a member country, Vila's services were targeted at the type of commercial lending that the IIC Charter describes as part of the functions that "the Corporation shall undertake" "[i]n order to accomplish its purpose." IIC Charter art. I, § 2. The IIC reaffirms on appeal that independent consultant services provide important assistance in carrying out its functions. Reply Br. at

6-7, 11. Vila was thus neither volunteering his services nor providing services unrelated to the IIC's purpose. As Vila's services were related to the furtherance of the IIC's stated objectives in the commercial marketplace, *Mendaro*, 717 F.2d at 618, the fact that his claim arises from an independent contractor's view of the credibility of the IIC's promises, and not a third party investor's view of the credibility of the IIC's financial dealings, is a distinction of no significance. The court's reasoning in *Osseiran* about the hesitancy of parties to do business with an organization insulated from judicial process, 552 F.3d at 840, is no less applicable here.[3] The IIC's attempts to show to the contrary are unpersuasive.

First, the IIC maintains that allowing Vila's unjust enrichment claim to proceed is of no benefit to it because he was a volunteer seeking compensation for unauthorized services. To the extent this reaches the merits of Vila's claim, it is irrelevant. At this stage of the proceedings. the court takes the allegations of the complaint as true, *Jerome Stevens Pharmaceuticals*, 402 F.3d at 1253-54, and so views Vila as seeking recovery for authorized services. Further, the IIC's position offers no response to *Osseiran*'s observation that expectations of fair play are relevant to whether parties would hesitate to do business with an international organization. 552 F.3d at 840. An independent consultant with or without a formal contract would be similarly hesitant to do business with

---

[3] We note that although unjust enrichment claims may arise outside of the context of commercial transactions, because waiver of immunity for such claims might not provide a similar corresponding benefit to the organization, our holding does not address whether the IIC has waived immunity in contexts that neither involve contract negotiations nor implicate the contract and quasi-contract principles on which the instant case turns.

the IIC if there would be no reassurance of fair compensation for requested and received services unjustly retained by the IIC if their agreement or formal contract failed. The reasonableness of Vila's reliance on alleged promises of compensation does not militate against finding waiver. *See Osseiran*, 552 F.3d at 840 n.3. To the extent the IIC maintains it would receive no benefit from engaging an independent contractor outside of a formal written contractual agreement, the complaint alleges the services at issue were viewed as being of benefit by IIC officials. While the IIC offers that it has no need to waive its immunity to suit for unjust enrichment claims in order to recruit independent consultants, because it provides them with recourse for possible grievances by including an arbitration clause in their contracts, the merits of the IIC's approach for contracted consultants is beside the point at this stage of the proceedings.

Second, the IIC maintains that allowing Vila's unjust enrichment claim to proceed would deter the IIC from using independent contractors as consultants because it would no longer have assurance that the settlement of any disputes would be handled through arbitration and be limited to the scope of the contractual arrangement. If the IIC wants assurance that consultant disputes will be bound by arbitration, however, it can bar use of independent consultants who have not been engaged through a formal agreement.

Finally, the IIC maintains that allowing Vila's unjust enrichment claim to proceed is tantamount to waiving immunity for commercial activity claims generally and would be contrary to *Inversora Murten, S.A. v. Energoprojekt-Niskograndnja Co.*, 264 Fed. App'x 13 (D.C. Cir. 2008), where the court held that the International Organizations Immunities Act, despite later amendments to the Foreign Sovereign Immunities Act, preserves the immunity of international organizations for "commercial activity." However, drawing a distinction between

external activities and the internal management of international organizations reflects well-established precedent, *Mendaro*, 717 F.2d at 618, without creating an artificial category of waived claims. The court still is required to engage in a weighing of the benefits and costs that a waiver may entail, *id.* at 617; *see Osseiran*, 552 F.3d at 840-41, by focusing on the nature of the parties' relationship rather than the nature of the contested transaction and inquiring as to the reasons why the IIC would waive immunity for this type of suit.

Notably, the IIC has not identified countervailing costs that are distinguishable from the costs associated with a claim for promissory estoppel, *see Osseiran*, 552 F.3d at 840. Neither has it identified countervailing costs of the nature discussed in *Mendaro*, 717 F.2d at 618, whereby allowing unjust enrichment claims by independent consultants whose services the IIC requested and received in connection with its core functions would open it to "disruptive interference with its [lending] policies." Quite the contrary. Allowing such claims would mitigate possible hesitancies by independent consultants to negotiating and entering into formal contracts with the IIC by providing reassurance that if their agreement or formal contract failed, for whatever reason, they would be fairly compensated for any benefit they have provided that the IIC has unjustly retained. The IIC, in turn, also would be afforded flexibility in using independent consultants, including when time-sensitive matters require such services before a formal contract can be executed. These circumstances contrast sharply with the harassing interference noted in *Mendaro* of allowing a type of employee suit where an organization operates in many different countries. Whether the costs of litigating this type of dispute would make the IIC hesitant to use independent consultants is less clear, but the IIC did not posit any such costs. The most it stated was that "[c]onstruing the Charter provision as a waiver of immunity would open the door to potentially protracted

litigation," Appellant's Br. at 37. This general statement could be true of any lawsuit and offers no reason why these costs are not indistinguishable from the costs that would arise in promissory estoppel litigation, for which the court has found a waiver of immunity. Nor is it apparent that allowing suits for unjust enrichment that will enable the IIC to use consultants for the types of high level banking transactions at issue — syndicating loans for banks — could be characterized as imposing the type of disruptive harassment of concern in *Mendaro*.

Contrary to our dissenting colleague's suggestion, the posited "vagueness" of an unjust enrichment claim does not tilt the balance against waiver. The premise that unjust enrichment is "a cause of action so much vaguer and broader than promissory estoppel," Dis. Op. at 2, because a plaintiff in an unjust enrichment action is required to demonstrate that the recipient's retention of the benefit would be "unjust," is flawed. Both doctrines potentially deal with the vagaries that may exist in order to remedy the injustice that would result if courts failed to enforce quasi-contractual obligations. The doctrine of promissory estoppel specifically requires that courts not give effect to reliance on a promise "unless necessary to avoid injustice," *Granfield v. Catholic Univ. of America*, 530 F.2d 1035, 1041 (D.C. Cir. 1976), and when evaluating this "injustice" prong, courts properly consider, among other factors, "the formality of the promise, whether there is a commercial setting and its nature, and whether there is unjust enrichment." *Id.* (citing RESTATEMENT (SECOND) OF CONTRACTS § 90, Cmt. (b)); *see, e.g., Oates v. Teamster Affiliates Pension Plan*, 482 F. Supp. 481, 489 (D.D.C. 1979). That courts consider unjust enrichment when evaluating claims for promissory estoppel undermines any suggestion that unjust enrichment is, in general, a vaguer cause of action than promissory estoppel.

Furthermore, the "vagueness" of a cause of action is an unhelpful paradigm in which to balance costs and benefits. The crux of the dissent is its assertion that the vaguer a cause of action, the more expensive it will be to litigate. The dissent cites no authority for this proposition and it is not "obvious[]," Dis. Op. at 4, why this proposition would be true. To illustrate, the dissent emphasizes in discussing why promissory estoppel is less vague than unjust enrichment that promissory estoppel's requisite promise must be a "a promise with definite terms." Dis. Op. at 3 (emphases omitted) (quoting *In re U.S. Office Prods. Co. Secs. Lit.*, 251 F. Supp. 2d 77, 97 (D.D.C. 2003)). Yet parties will often disagree over what constitutes a "definite term," *see, e.g.*, *Granfield*, 530 F.2d at 1040, just as they can disagree over any subjective element of a cause of action. In a given case, such a disagreement may result in more protracted litigation than a disagreement over whether retention of a benefit is "unjust"; in another case, it may not. Either way, the "vagueness" of the cause of action provides little assistance in assessing beforehand whether litigation for this type of suit would be protracted, especially given that the cost of litigation is more directly affected by such factors as the number of relevant documents that the case is likely to produce, the contentiousness of the parties, and the complexity of particular facts, all of which will vary from case to case and none of which turns on the vagueness of the cause of action.[4]

---

[4] The dissent is mistaken when it suggests the court is dismissing, for determinations of immunity, the general costs of litigation, Dis. Op. at 6-7. *Atkinson*, cited by the dissent, described the costs of litigating wage garnishment suits, noting that the court was "skeptical" that such costs would be "minimal." 156 F.3d at 1339. But because the court in that case determined that garnishment suits would provide "no conceivable benefit" – indeed would constitute a detriment in attracting employees – the court had no need to balance those

15

**III.**

The IIC's defense that Vila's unjust enrichment suit fails because it was untimely filed and therefore must be dismissed for failure to state a claim pursuant to Rule 12(b)(6) is logically antecedent to the merits of Vila's claim. *Killburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1134 (D.C. Cir. 2004); *see also Rendall-Speranza v. Nassim*, 107 F.3d 913, 917 (D.C. Cir. 1997). As a matter of judicial efficiency, we exercise pendant jurisdiction over this threshold issue, *see Griggs v. WMATA*, 232 F.3d 917, 919 n.2 (D.C. Cir. 2000); *Gilda-Marx, Inc. v. Wildwood Exercise, Inc.*, 85 F.3d 675, 678,

costs and thus gave no guidance as to what kind of benefit would outweigh them. And, in any event, the litigation costs in *Atkinson* were costs that "a stranger to the proceedings in which a judgment has been obtained," who was thus an "innocent third party," would have to bear to protect his relations with third parties, *id*. (citing authorities on the burdens of garnishment proceedings). Thus, conceivably a greater benefit would be required to outweigh them than to outweigh costs in a suit in which the organization was a direct participant, if for no other reason than that an organization's exposure to suits stemming entirely from the independent actions of others is completely beyond its own control. But however litigation costs might factor into the balancing test in another case, the IIC has not posited litigation costs distinguishable from those involved in promissory estoppel suits for which the court found a waiver of immunity in *Osseiran*. *See* IIC Rule 28(j) Letter, Feb. 10, 2009; Oral Arg. at 14:20-15:48 (attempting to distinguish *Osseiran* based not on costs, but rather on the lesser benefit that would inure to the IIC as a result of exposure to this type of suit). Just as those costs did not outweigh the benefit to the organization in *Osseiran*, they do not outweigh the benefit to the IIC here.

679 (D.C. Cir. 1996) (per curiam), and affirm the denial of the motion to dismiss.

Under District of Columbia law, which applies here, unjust enrichment claims are subject to a three year statute of limitations. *See News World Commc'ns, Inc. v. Thompsen*, 878 A.2d 1218, 1221 (D.C. 2005). Thus, if Vila's claim accrued prior to October 26, 2003, it would be time barred. Vila alleges that his last service was performed, his request for compensation was refused, and the benefit of his service had been conferred at some date later than this date.

The D.C. Court of Appeals held in *Thompsen* that the statute of limitations begins to run "when the plaintiff's last service has been rendered and compensation has been wrongfully withheld." *Id.* at 1219. The court relied on *Zic v. Italian Gov't Travel Office*, 149 F. Supp. 2d 473 (N.D. Ill. 2001), noting that *Zic* emphasized that "'the essence of a *quantum meruit* claim . . . is not the plaintiff's expectancy of payment, but the unjust enrichment of the defendant,' and held that the defendant was unjustly enriched when the services were rendered and when payment was refused." *Thompsen*, 878 A.2d at 1223 (quoting *Zic*, 149 F. Supp. at 476). In *Thompsen* the court emphasized that "[a] claim for unjust enrichment only accrues . . . when the enrichment becomes unjust; the statute of limitations starts to run upon the occurrence of the wrongful act giving rise to a duty of restitution." *Id.* (quotations omitted). Applying this test to the plaintiff, the court focused on the date when her last service had been performed, compensation had been refused, and the benefit of her service had been conferred. *Id.* at 1225. Although the court cited *Baer v. Chase*, 392 F.3d 609, 622-23 (3rd Cir. 2004), which applied a last-rendition test, that case did not involve a communicated refusal to pay, a question reserved in *Thompsen*, 878 A.2d at 1225 n.7.

Thus, contrary to the IIC's contention, District of Columbia law does not establish a last rendition of services test for the accrual of an unjust enrichment claim, and its reliance on August 2003 as the last month in which Vila provided services is misplaced. The IIC's alternative contention that Vila's claim accrued prior to October 26th, 2003, pointing to August 4, 2003, the date on which Vila alleges that Regional Head Moscoso acknowledged his work but refused to compensate it, fares no better.

The limitations period on an unjust enrichment claim does not begin until "enrichment becomes unjust," *Thompsen*, 878 A.2d at 1223, which is a question of fact for the district court to resolve, *Diamond v. Davis*, 680 A.2d 364, 370 (D.C. 1996). In resolving the question at this stage of the proceedings, the court reviews the district court's order denying dismissal on limitations grounds *de novo,* accepting the allegations in the complaint as true, *Browning*, 292 F.3d at 242, and granting Vila "the benefit of all inferences that can be derived from the facts alleged," *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). Contrary to the dissent, Dis. Op. at 10-14, although the complaint does state that the August 4th email from Moscoso "acknowledged his work but refused to compensate it," Compl. ¶ 14, the district court could find, upon granting Vila the benefit of all reasonable inferences arising from the allegations in his complaint, that enrichment became unjust only on November 4. On that date Alejandra Vallejo, the Coordinator of Institutional Affairs in the Personnel and Administration Office of the IIC, advised Vila, after he had submitted an invoice to the IIC's General Manager Jacques Rogozinski, that he would not be compensated for his services in the absence of a formal contract. Compl. ¶ 5. That email rejected Vila's first request for a specific amount of compensation for the various services at issue, after submission of an invoice to a top official and by the office that handles such

personnel-related matters. A finding that this email, and not Moscoso's August 4 email, started the limitations period is further supported by Vila's allegations that he worked on four different projects in 2003, only two of which involved Moscoso (as indicated by the emails attached to his complaint). Vila's submission of an invoice to someone at the top of the chain of command, therefore, was the first point in time the IIC would have known the totality of the work – and its costs – that it was being asked to pay; its subsequent refusal was the first unequivocal refusal for all his work that year.

The dissent incorrectly suggests this case is indistinguishable from *Thompsen*, Dis Op. at 14-15, which held that the plaintiff's cause of action had accrued no later than the date that the advertising director of *The Washington Times* advised her she would not be compensated for her work. The facts here, however, are different in material ways. First, Vila worked on four projects for several persons within the IIC, while Thompsen presented only one proposal to the newspaper and her relevant contact was the newspaper's advertising director, who conveyed to her the newspaper's decisions about her project. The district court could reason, therefore, that a refusal to compensate by any one of the persons for whom Vila worked would be less final than the refusal that Thompsen received from the advertising director. Second, Vila's relationship with the IIC was different than Thompsen's relationship with the newspaper. Although Thompsen could also be described as an independent contractor, Vila had a longer history with the IIC, working on various projects with the IIC for three years prior to 2003, and alleged the services for which he now seeks compensation were requested by several persons at the IIC, unlike the one-on-one relationship in *Thompsen* where the advertising director was Thompsen's point of contact on her project. When Vila exchanged emails with Moscoso and Reed concerning compensation, therefore, he

might reasonably have anticipated that he could go to their superior, General Manager Rogozinski, if his requests for compensation were rebuffed and that Rogozinski would make the final decision, either directly or through appropriate channels. The emails attached to Vila's complaint indicate this is what happened, as Rogozinski forwarded Vila's invoice to the Personnel and Administration Office, which then informed Vila that based on the IIC's policies it would not be able to compensate him for his services.

This approach does not, as the dissent suggests, create a new rule that limitations periods can be extended with "repeated appeals," Dis. Op. at 16. Rather, the limitations period on an unjust enrichment claim does not begin until "enrichment becomes unjust." *Thompsen*, 878 A.2d at 1223. In resolving this fact-bound question, the district court could find the operative accrual date to be the date of rejection of a contractor's bill for services, especially when several IIC employees had requested Vila's services and the presentment and rejection of the invoice was not so far in time from the rendition of the services. Our dissenting colleague would parse individual allegations that support a November 4 accrual date, rather than consider the allegations in their totality, *see* Dis. Op. at 14-16, and tweak Vila's allegations and the material distinctions with *Thompsen*, *see, e.g.*, Dis. Op. at 14, while overlooking that at this stage of the proceedings Vila is entitled to all favorable inferences in determining when the enrichment became unjust. Viewed in their totality, and according Vila all favorable inferences, Vila's allegations "plausibly give rise to an entitlement to relief," *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009), and we conclude that the district court properly declined to dismiss the complaint as untimely pursuant to Rule 12(b)(6). On remand the IIC can present evidence to support its limitations defense that August 4, 2003 was the actual date of refusal, *see Diamond v. Davis*, 680 A.2d at 370.

Accordingly, we affirm the order denying the IIC's motion to dismiss Vila's unjust enrichment claim pursuant to Rules 12(b)(1) and 12(b)(6), and we remand the case to the district court.

WILLIAMS, *Senior Circuit Judge*, dissenting: I respectfully dissent from the court's rejection of two defenses posed by Inter-American Investment Corporation ("IIC"): its claim of immunity to plaintiff's unjust enrichment claim and its invocation of the statute of limitations.

The immunity claim turns on the application of Article VII, § 3(a) of IIC's Charter, see Maj. Op. at 6, under the International Organizations Immunities Act, 22 U.S.C. § 288a-k. Although the clause might seem to be either a venue provision or an across-the-board waiver, we have, in *Mendaro v. World Bank*, 717 F.2d 610 (D.C. Cir. 1983), and later cases, construed such wording as waiving immunity only insofar as "necessary to enable the [organization] to fulfill its functions." *Id*. at 617. We explained in *Atkinson v. Inter-American Development Bank*, 156 F.3d 1335 (D.C. Cir. 1998), that *Mendaro* created a "default rule" under which the organization's "immunity should be construed as *not waived* unless the particular type of suit would *further* the [organization's] objectives." *Id*. at 1338. We explicitly rejected plaintiff's argument that the organization's "immunity should be construed as *waived* unless the particular type of suit would *impair* [its] objectives." *Id*.

Applying these concepts, in *Mendaro* we found no waiver for a claim under Title VII of the Civil Rights Act of 1964 by a member of the organization's administrative staff. Any benefits to the defendant from being subject to such suits, we said, would be "outweighed by the burdens caused by judicial scrutiny of the organization's discretion to select and administer its programs." *Mendaro*, 717 F.2d at 617. By contrast, we thought the immunity clearly covered suits involving the Bank's securities and its guarantees of others' securities, saying that the guarantees would mean little, and the Bank's securities would be unappealing to investors,

unless the Bank's obligations were enforceable in court. *Id.* at 618.

Our analysis, then, has been to consider whether the defendant organization would, ex ante, have regarded its subjection to the sort of suit in question as likely to provide the organization a net benefit. As *Atkinson* made clear, ties go to the organization.

After the briefing in this case we found in *Osseiran v. International Finance Corporation*, 552 F.3d 836 (D.C. Cir. 2009), that the defendant should be deemed to have waived immunity to a promissory estoppel claim based on alleged promises made during negotiations over the entity's sale of securities to a private party. Noting that promises based on good faith alone are worth less than ones enforceable in court, we decided that a waiver of immunity "might help attract prospective investors by reinforcing expectations of fair play." *Id.* at 840.

The court here extends *Osseiran* to unjust enrichment claims arising in the context of commercial transactions, at least if the case involves "contract negotiations [or] implicate[s] the contract and quasi-contract principles on which the instant case turns." Maj. Op. at 10 n.3. Because unjust enrichment is a cause of action so much vaguer and broader than promissory estoppel, I believe the plausible benefits are thinner and the likely costs fatter here than in *Osseiran*—enough so that the *Mendaro* balance tilts against waiver.

A successful promissory estoppel claim requires "a *promise* which reasonably leads the promisee to rely on it to his detriment, with injustice otherwise not being avoidable." *N. Litterio & Co. v. Glassman Const. Co.,* 319 F.2d 736, 739 (D.C. Cir. 1963) (emphasis added). Though the promise

required for a promissory estoppel claim "need not be as specific and definite as a contract, it must still be *a promise with definite terms.*" *In re U.S. Office Products Co. Securities Lit.*, 251 F. Supp. 2d 77, 97 (D.D.C. 2003) (emphases added) (citing *Bender v. Design Store Corp.*, 404 A.2d 194, 196 (D.C. 1979)).  Unjust enrichment, by contrast, requires only that: "(1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances the defendant's retention of the benefit is unjust."  *News World Communications v. Thompsen*, 878 A.2d 1218, 1222 (D.C. 2005) (citing *4934, Inc. v. D.C. Dept. of Employment Servs*, 605 A.2d 50, 55 (D.C. 1992)).  Thus unjust enrichment dispenses with the need for a definite promise, and requires in its place only a finding that the recipient's retention of the benefit would be "unjust," as determined by some fact-finder.  The doctrine appears as elastic as the proverbial chancellor's foot.

While an organization's exposure to promissory estoppel claims may, at the margin, entice into negotiations people who attach value to being able to reasonably rely on definite promises by an organization's agents, it is uncertain just who might be heartened by unjust enrichment doctrine's vague assurances.  Although the majority seeks to nudge this case toward *Osseiran* by suggesting that it involves "the credibility of the IIC's promises," Maj. Op. at 10, and thus perhaps the comparatively hard-edged quality of promissory estoppel, in fact Vila's complaint makes no assertion whatever of promises by IIC—indeed, he never mentions the term.  Quite rightly: unjust enrichment requires no evidence of promise.  See *Jordan Keys & Jessamy, LLP v. St. Paul Fire & Marine Ins.*, 870 A.2d 58, 64 (explaining that unjust enrichment is not based on "a promise or agreement or intention of the person sought to be charged," but on "equity and good conscience" (quoting *Miller v. Schloss*, 113 N.E. 337, 339 (N.Y. 1916))).

In finding the benefit from exposure to unjust enrichment suits *equal* to that of exposure to promissory estoppel claims, the majority asserts that independent consultants would be "*similarly* hesitant to do business" absent the availability of unjust enrichment claims. Maj. Op. at 11 (emphasis added). But promissory estoppel enables one to reasonably rely on actual, definite promises; unjust enrichment protects the party only in scenarios where his sense of injustice happens to be shared by a jury. Apart from the likely difference in number of persons whose hesitancy may be relieved, promissory estoppel protection seems likely to draw in a more careful, businesslike set of counterparties.

On the cost side, unjust enrichment's malleable nature means that being subject to such suits will expose IIC both to a much broader class of cases, and ones where the controlling issues are less sharply defined. The most obvious costs, of course, are the expenses of litigation itself, both out-of-pocket costs and the inevitable diversion of management focus. In *Atkinson*, though we didn't need to "consider the cost side of the balance," 156 F.3d at 1339, we expressly cited the "inconvenience, hazards, or expense of extended litigation" as a reason to doubt that the costs of a waiver of immunity in that case were minimal. *Id.* As the murkiness of the cause of action expands, so too, obviously, do the "inconvenience, hazards, or expense" of litigation."

The majority suggests that because courts also "consider unjust enrichment when evaluating claims for promissory estoppel," promissory estoppel must be every bit as vague as unjust enrichment. Maj. Op. at 13. But in the presence of promissory estoppel's requirement of a definite promise and reasonably foreseeable reliance, "unjust enrichment" seems unlikely to do much work in promissory estoppel cases; juries who find those two discrete points seem unlikely to worry much over elusive concepts of "injustice."

Without some sort of empirical work it may be hard to calculate the exact effect of unjust enrichment's vagueness. At a minimum, however, it would seem to increase the variance in outcomes, i.e., to quote *Atkinson*'s term, the "hazards" of litigation. For risk-averse litigants, variance is a material cost, even if plaintiffs win the same proportion of litigated unjust enrichment cases and enjoy the same average recovery as in promissory estoppel ones.

Besides, the majority's claim that promissory estoppel requires a consideration of unjust enrichment in addition to its other elements entirely confirms the point that unjust enrichment claims reach a broader class of cases. That is why, in many cases, an unjust enrichment claim will survive after the court has thrown out promissory estoppel—even in the context of the commercial negotiations to which the majority tries to restrict its holding. See, e.g., *Trianco, LLC v. IBM*, 271 Fed. Appx. 198, 203, 205 (3d Cir. 2008) (allowing an unjust enrichment claim to proceed, but dismissing a promissory estoppel claim because there was no "clear and unambiguous promise" (internal quotation marks omitted)); *Lindquist Ford, Inc. v. Middleton Motors*, *Inc.*, 2007 WL 3287848, at *8, *11 (W.D. Wis.), rev'd on other grounds, 557 F.3d 469 (7th Cir. 2009) (denying a motion for "summary judgment on plaintiff's unjust enrichment claim," but dismissing the plaintiff's promissory estoppel claim because "plaintiffs have failed to adduce any evidence that defendant ever promised . . . ."). Thus, the majority's own reasoning illustrates why a waiver of unjust enrichment claims— untethered to a need for proof of a definite promise and reasonable reliance—exposes the IIC to a wider range of cases that would be costly to litigate.

Of course the majority is correct in saying that factors other than a cause of action's protean character may complicate a case and generate high litigation costs, such as

the volume of documents and the contentiousness of the parties. Maj. Op. at 14. But until the majority's decision here, we have measured costs and benefits in terms of the cause of action and the type of plaintiff, not specifics of the case, presumably in order to achieve some measure of predictability. If I understand the majority correctly, its thought is that because there are cost factors that "vary from case to case," we cannot meaningfully estimate the cost ranges associated with a particular cause of action. That seems a non sequitur.

In a similar vein, the court says that even though *Atkinson* clearly considered litigation expenses on the cost side of the equation, we cannot weigh them in this case because the *Atkinson* court gave "no guidance as to what kind of benefit would outweigh them." Maj. Op. at 15 n.4. To be sure, *Atkinson* did not need to weigh litigation costs; it found that subjection to wage garnishment proceedings would provide "no conceivable benefit" and ties go to the organization claiming immunity. *Atkinson*, 156 F.3d at 1338. But the fact that the *Atkinson* court did not explain how we are to weigh litigation costs cannot absolve us of the need to do so today.

The majority dismisses the IIC's arguments regarding litigation expenses on several additional grounds. First, though it recognizes that the IIC pointed to litigation costs, see Maj. Op. at 12-13, 15 n.4, it appears to chide IIC for failing to differentiate the litigation costs likely to be associated with unjust enrichment claims from those associated with promissory estoppel suits. Maj. Op. at 13, 15 n.4. But, as I mentioned before, *Osseiran* was decided only after the close of briefing in this case, and there we appeared to have no need to assess litigation costs at all; the defendant's theory was apparently little more than that it was right on the merits. Moreover, as we are basically comparing *causes of*

*action*, we should be perfectly able to do the comparison on our own.

The majority also seems to dismiss the IIC's arguments regarding litigation costs on the grounds that these costs "could be true of any lawsuit." Maj. Op. at 13. Of course, if litigation costs *alone* were enough to overcome *all* potential benefits from a waiver of immunity, then courts could never find a waiver. But under *Mendaro* and *Atkinson* we are obliged to weigh the reality of litigation costs, which are after all typically substantial, against the hypothetical benefit of the institution's being subject to suit. Otherwise we jettison *Atkinson*'s understanding that *Mendaro* created a "default rule" under which the organization's "immunity should be construed as *not waived* unless the particular type of suit would *further* the [organization's] objectives." 156 F.3d at 1338.

And, though acknowledging that *Atkinson* makes the relevance of litigation costs plain, the court suggests that because that case involved costs from an organization's indirect participation in a wage garnishment proceeding, "a greater benefit would be required to outweigh them." Maj. Op. at 15 n.4. I do not understand the relevance of this point (let alone its justification), for in the end the majority either believes IIC's litigation costs should be disregarded altogether (because they are "true of any lawsuit"), or simply rests on its conclusion that they are likely to be no greater than in promissory estoppel cases.

Apart from litigation costs, the IIC identifies an added element on the "cost" side of the balance, saying that without the "assurance" of arbitration, for which it provides when engaging independent consultants, see Agreement 2002, Joint Appendix ("J.A.") 37, it would be "deterred from seeking to use independent contractors as consultants." Appellant's Br.

36. Although the utility of such consultants to IIC is undisputed (indeed, is the basis for the majority finding of a "benefit"), the court's holding plainly makes its use of them more expensive. Any initial employee contact with a potential consultant will carry a risk of litigation, not to mention deny IIC the benefit of the arbitration provision that it insists on in its contracts. The court notes the impact, but offers IIC a strange solution. If IIC truly values arbitration, it says, "it can bar use of independent consultants who have not been engaged through a formal agreement." Maj. Op. at 11. The court does not explain just how such an internal IIC policy could prevent third parties from bringing unjust enrichment suits. Perhaps the panel means that by living a completely virtuous life IIC can avoid litigation. But apart from the naiveté of the implied assumption about the filing of lawsuits, the argument has no place in our precedents, which have always focused on the costs that would come from particular types of claims, and has never inquired into whether or not an organization could prevent others from bringing such claims in the first instance. Indeed, this new factor sounds very like the merits, which we so roundly (and rightly) ruled off-limits in *Osseiran*. 552 F.3d at 840. Finally, however effective a policy aimed at reducing the risk of this sort of litigation might prove, it would itself come at a cost—that of increased monitoring of employees' compliance. The court's ruling generates these costs all in order to give IIC the "benefit" of attracting consultants who do not bother to clarify their contractual status before proceeding to work.

Allowance of unjust enrichment claims thus generates greater costs and fewer benefits than the promissory estoppel claims permitted in *Osseiran*. I see no basis for concluding that a waiver of immunity is "necessary to enable [IIC] to fulfill its functions." *Mendaro*, 717 F.2d at 617.

9

* * *

As to Part III of the majority opinion, concerning IIC's statute of limitations defense, I agree with the majority that we should exercise pendant jurisdiction over the statute of limitations issue. See Maj. Op. at 15. I also agree that under District of Columbia law the statute is triggered not solely by the plaintiff's last rendition of services, but by defendant's refusal of compensation for those services. See Maj. Op. at 17. Thus, if prior to October 26, 2003, Vila's "last service has been rendered *and* compensation has been wrongfully withheld," *News World Communications Inc. v. Thompsen*, 878 A.2d 1218, 1219 (D.C. 2005) (emphasis added), Vila's claim is barred. But I disagree with the court's conclusion that Vila's suit is not barred.

Vila argues that we should review the district court's determination in his favor under a clearly erroneous standard, see Appellee's Br. 15-16, but this is clearly wrong. The district court correctly observed that "[o]n a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), [the court] must construe the allegations and facts in the complaint in the light most favorable to the plaintiff. " *Vila v. Inter-American Investment Corp.*, 536 F. Supp. 2d 41, 45-46 (D.D.C. 2008) ("*District Court Opinion*"). We review such rulings *de novo*. *Kaemmerling v. Lappin*, 553 F.3d 669, 676 (D.C. Cir. 2008); see also, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) (conducting a de novo review of plaintiffs' 12(b)(6) motion). The panel today grants that we must apply the traditional de novo standard of review to Vila's 12(b)(6) claim and that the determination of when Vila's enrichment claim became unjust is based upon "granting Vila the benefit of all reasonable *inferences*." Maj. Op. at 17 (emphasis added). Yet the court also says that when enrichment becomes unjust "is a question of fact for the

district court to resolve." *Id.* at 17. Insofar as this may imply that we should adopt the clearly erroneous standard of review urged by Vila, it runs directly contrary to our precedent and the Supreme Court's practice. Hence, I will proceed under the traditional de novo standard: if Vila's claimed date of the first legally relevant refusal is not plausibly supported by "the facts alleged" and "the allegations in the complaint," we must reverse. *Id.*

Vila's complaint alleges that his "[s]ervices were performed . . . and accepted by Defendant's senior officers and senior management from January to August 2003." Compl. 11. Hence, there can be no doubt that Vila's "last service ha[d] been rendered" prior to October 26, 2003. The only remaining issue then is whether IIC had refused to compensate Vila before that date.

As the court points out, Vila alleges at the outset of his complaint that he was refused payment on November 4, 2003. Maj. Op. at 17. The IIC does not contest that *a* refusal took place on November 4, 2003. What the IIC does contest, however, is Vila's inference that the November 4, 2003, e-mail was the first *legally relevant* refusal to take place. And while the pleading standards required by Rule 12(b)(6) are extremely liberal, "the court need not accept inferences drawn by plaintiffs if such inferences are unsupported by *the facts set out in the complaint*[, nor must it] accept legal conclusions cast in the form of factual allegations." *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994) (emphases added).

Vila's complaint itself specifically alleges *facts* and *inferences* contradicting his claim that the first legally relevant refusal occurred on November 4, 2003. "On August 4, 2003, in an e-mail replying to Plaintiff's further compensation claims . . . [Victor] Moscoso acknowledged Plaintiff's work,

but *refused* to compensate it." Compl. ¶ 14 (emphasis added). Victor Moscoso was the IIC Regional Head with whom Vila had discussed his compensation expectations for *all* of his services and who, according to Villa, had acknowledged Vila's compensation expectation on IIC's behalf on a prior occasion. See Compl. ¶ 11-13. But on August 4, 2003, again in Vila's own words, "Mr. Moscoso attempted to justify the *refusal* to pay for Plaintiff's Services and suggested *entirely new terms for future work* by Plaintiff." Compl. ¶ 14 (emphases added). Thus Vila clearly characterizes his e-mail contacts with Victor Moscoso as establishing that by August 4, 2003 Vila had provided his work to IIC and that IIC "refused" payment for *that work*, as opposed to "future work." And since an unjust enrichment claim accrues "when its elements are present, so that the plaintiff could maintain a successful suit," *Thompsen*, 878 A.2d at 1222, Vila's own words establish that his claim had accrued before October 26, 2003.

Vila's assertions about the Moscoso correspondence are enough to show that IIC should prevail, but his complaint contains further allegations contradicting his view that payment was first refused on November 4, 2003. "Following Mr. Moscoso's *refusal*, Plaintiff *appealed* to Steven Reed, Defendant's Deputy General Manager, *in an attempt to obtain compensation*." Compl. ¶ 14 (emphases added). Of course, Vila's unilateral decision to appeal Moscoso's "refusal" could not extend the limitations period, regardless of how Reed responded: "Otherwise, a party could indefinitely extend the accrual date for the statute of limitations by simply making periodic requests of another party to enter an agreement." *GIV, LLC v. Int'l Bus. Machines Corp.*, 2007 WL 1231443, at *3 (E.D. Va. Apr. 24, 2007). See also *Del. State College v. Ricks*, 449 U.S. 250, 261 n. 15 (1980) ("Mere requests to reconsider . . . cannot extend the limitations period[]"). In any event, Reed, like Moscoso before him, "acknowledged

Plaintiff's considerable amount of work, but *refused* to pay for Plaintiff's Services, alleging . . . a different understanding of the agreement between Plaintiff and Defendant and the absence of a written contract." Compl. ¶ 15 (emphasis added) (internal quotation marks omitted). Thus, according to Vila's allegations, IIC *twice* refused to pay him before October 26, 2003.

The district court declined to give these refusals legal effect, saying that "none of the emails that predate the November 4, 2003 email . . . were sufficiently unequivocal to cause the unjust enrichment claim to accrue." *District Court Opinion*, 536 F. Supp. 2d at 51. Specifically, the district court pointed to the fact that in both an August 28, 2003 e-mail and a September 12, 2003 e-mail Reed had alluded to the possibility that Vila could receive a "success fee for *some* of his work." *Id*. This argument fails for numerous reasons. First and foremost, under Vila's own characterization of the prior correspondence, Moscoso "refused to compensate" Vila's work, and after "attempt[ing] to justify the refusal . . . suggested entirely new terms for *future* work." Compl. ¶ 14 (emphasis added). Rule 12(b)(6) of course requires us to draw all reasonable inferences in favor of the plaintiff, but it surely doesn't require us to *disregard factual allegations* that flatly undermine a complaint.

Second, the district court was mistaken in its theory that Reed's mention of a success fee somehow qualified the refusal. To be sure, Reed said in an August 28, 2003 e-mail that IIC "expect[ed] to sign the Safra agreement [on which Vila had worked] soon," and that he would have a contract on the Safra matter prepared "so that when Safra instructs us to go to market, an agreement with you will be in place." E-mail 262, J.A. 167. This needed confirmation from another IIC official, he said, but "I don't see a problem. You will be compensated based on a success fee." *Id*. But the *possibility*

of *some future compensation*, which the district court recognized would only have been for "some work" Vila completed, *District Court Opinion*, 536 F. Supp. 2d at 52, could not toll the statute of limitations because there is no reasonable basis for thinking that the success fee operated as any sort of substitute for the compensation Vila requested.

Indeed, Vila's complaint treats Reed's position as a refusal and rejects the notion of a success fee as a basis for payment. Vila points out "that there was no reference to compensation on a success fee basis in any of the numerous e-mails received from [IIC] senior officers, or in any other documentation exchanged between Defendant and Plaintiff from January to August 2003." Compl. ¶ 17, J.A. 18. Consequently, Vila "*reiterated* his compensation claim" to Reed, which Reed again rejected, and Vila then submitted an invoice for $ 89,909.00. Compl. ¶¶ 17-18 (emphasis added). As the district court correctly found, this invoice amount, which Vila now requests as damages, "is based on calculations using a daily consulting fee," not on a success fee calculation. *District Court Opinion*, 536 F. Supp. 2d at 50. As Reed stated after Vila reiterated his claim for compensation following Reed's initial rejection, "I don't understand how you expected compensation on any basis other than a success fee." E-mail 264, J.A. 168. Given that Vila sought compensation for *all* of his work, on an entirely different mode of compensation, we should interpret Reed's e-mail as Vila did—as a clear refusal of the compensation he requested and which he now requests in the current suit. Accord, *Phillips v. Scott*, 446 F. Supp. 2d 70, 82 (D. Conn. 2006) (unjust enrichment action accrued when mother refused to turn over proceeds of a property sale to son, even though mother mentioned "she might, at some unspecified time in the future, pay him some small portion of those proceeds").

Oddly enough, though the district court regarded IIC's November 4, 2003 e-mail as an unequivocal refusal on the theory that it did not include the possibility of "some compensation," *District Court Opinion*, 536 F. Supp. 2d at 52, that e-mail in fact did not rule out the possibility of a success fee. According to the complaint, once Vila "reiterate[d]" his invoice based on a daily consulting fee, IIC refused the requested payment on precisely *the same grounds* as Reed's earlier e-mails—"the absence of a contract under 'defined terms and conditions.'" Compl. ¶ 19. There is simply no meaningful differentiation between this e-mail and any of its predecessors.

The court today crafts an entirely new theory for the accrual of Vila's unjust enrichment claim—one not found in Vila's briefs, the district court opinion, or any relevant case law. The court seems to base its conclusion that "the district court could find . . . that enrichment became unjust only on November 4," on three arguments, none of which is persuasive. Maj. Op. at 17. First, the court claims that this was the first time Vila had submitted an invoice for a "specific amount of compensation." *Id.* at 17. The prior e-mails to Moscoso and Reed, however, rejected the notion of *any* payment on Vila's requested basis. Thus, whether Vila *later* asked for $1 or $1,000,000 was irrelevant, as he was aware he would not be getting any money without a written contract. Additionally, in *News World Communications, Inc. v. Thompsen*, 878 A. 2d 1218 (D.C. 2005), which governs here, the court found the plaintiff was refused payment not when she submitted an invoice, but when she received a phone call simply stating that "she would not be paid for her ideas or for the work she had done." *Id.* at 1220. *Thompsen* explicitly held that it was enough that this phone call "informed [the plaintiff] that she would not be compensated." *Id.* at 1222. Thus, there is simply no reason to think an invoice for a specific amount is necessary to start the statute running.

Second, the court argues that the e-mails to Moscoso did not cause the statute of limitations to accrue because only two of Vila's projects involved Moscoso, and hence Moscoso would not have "known the totality of the work," as the Personnel Office did. Maj. Op. at 18. The court argues that this makes the case distinguishable from *Thompsen* because there the plaintiff had a "one-on-one" relationship with the advertising director, who worked with the plaintiff on all the work she performed. *Id*. But Vila explicitly alleges that he spoke with Moscoso at the outset about compensation for the *entirety* of his services. See Compl. ¶ 13 (using the defined term "Services," which referred to all services, when explaining that "Plaintiff's compensation expectation for the Services was discussed with Victor Moscoso" ). There is also no reason to believe the rejection from Reed, Moscoso's superior, was for fewer than all the projects. Additionally, in *Thompsen* the plaintiff had contacts with "several other representatives" besides the advertising director. *Thompsen*, 878 F.2d at 1220. The advertising director in *Thompsen* was the "relevant contact," Maj. Op. at 18, only because he was the person who had confirmed the plaintiff's compensation expectations on a prior occasion, just as Vila alleges Moscoso had done. And the refusal in *Thompsen* did not come from the personnel department. The court offers no explanation why an e-mail from a personnel department official should be regarded as anything other than a reiteration of the refusal already communicated by a high-level official of the IIC, the Deputy General Manager, Steven Reed.

Third and finally, the court claims that because Vila worked for several people he could "have anticipated that he could go to their superior, General Manager Rogozinski, if his request for compensation were rebuffed"; the court claims the e-mails "indicate this is what happened." Maj. Op. at 19. Not only does this argument seem entirely inconsistent with the precedent limiting a plaintiff's ability to extend limitations

deadlines with repeated appeals, but, as already mentioned, Vila had previously discussed his compensation expectation for *all* services with both Moscoso and Reed (only one level below Rogozinski in the corporate hierarchy). Moreover, the e-mails hardly reveal the "appeals" process that the court dreams up. Rogozinski's *only* response to Vila asked Vila not to contact him any more, but instead to pass his written consultant agreements on to the Personnel Office. E-mail 268, J.A. 175. Of course, Vila did not have such written agreements and already knew from his correspondence with Steven Reed that without such agreements he would not be paid, so it was hardly surprising when the personnel department then reiterated the exact same denial that Reed had already communicated.

The court's readiness to treat any rejection as non-final has puzzling implications. If the refusal by the Deputy General Manager (Reed) was not enough because there was someone higher up in the chain, then it is entirely unclear why that of Rogozinski would start the statute of limitations running. After all, even after hearing from the Personnel Department, Vila "reiterated his claim" to the IIC's President over the course of the next nine months. Compl. ¶¶ 20-21. Since a claim for unjust enrichment accrues only when all of its elements are present, the implication of the majority's position is that Vila *could not* have brought a claim after the Moscoso or Reed e-mails refusing to pay him the very compensation he now claims he is owed, and perhaps cannot do so now—unless IIC's President has actually rejected the claim.

The court faults all of the above arguments on the grounds that I "parse" Vila's allegations instead of considering them in their "totality" and giving Vila the benefit of all favorable inferences. Maj Op. at 19. But one allegation with zero relevance, added to a dozen similar allegations, still

results in allegations with zero relevance. In reality, my opinion gives Vila the benefit of all reasonable inferences, as it accepts Vila *at his word*: his complaint states he was "refused" compensation long before November 4, and characterizes all his subsequent contacts as "reiterat[ions]" and "appeal[s]." The court, by contrast, goes out of its way to find inferences flatly contradicted by the allegations in Vila's complaint, based on a theory that has no foundation in our case law or that of the District of Columbia. Accordingly, were it necessary to go beyond IIC's immunity defense, which it is not, I would reverse on the ground of its statute of limitations argument, just as the court did in *Thompsen*, 878 A.2d at 1226.